[Cite as *State v. James*, 2020-Ohio-4289.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

GREGORY JAMES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 MA 0064**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 17 CR 1276

**BEFORE:**
Gene Donofrio, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul Gains, Prosecutor, Atty. Ralph Rivera, Assistant Prosecutor*, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee, and

*Atty. Samuel Shamansky, Atty. Donald Regensburger, Atty. Colin Peters, Atty. Sarah Hill*, Samuel H. Shamansky Co., L.P.A., 523 South Third Street, Columbus, Ohio 43215, for Defendant-Appellant.

Dated:
August 19, 2020

**DONOFRIO, J.**

{¶1}     Defendant-appellant, Gregory James, appeals his convictions in the Mahoning County Common Pleas Court following a jury trial for two counts of aggravated murder, one count of attempted murder, three counts of felonious assault, one count of aggravated burglary, one count of intimidation of a witness, and seven firearm specifications.

{¶2}     On March 8, 2017, Javel Bates was at the Youngstown, Ohio home of his half-brother, Ronald Lewis.  Javel eventually left Ronald's house and returned later the same day.  When Javel returned, Ronald noticed that Javel's car had numerous bullet holes in it and Javel had been shot.  Ronald called 911 to report that Javel had been shot.

{¶3}     An ambulance arrived to transport Javel to the hospital.  After the ambulance left, Detectives David Sweeney and Ronald Barber of the Youngstown Police Department arrived at Ronald's house.  Detective Sweeney inspected Javel's car and observed numerous bullet holes and a large amount blood on the driver's side floor.  Detective Sweeney then questioned Ronald as to what happened to Javel.  Ronald was initially hesitant to discuss what happened to Javel.  Eventually, Ronald said that Javel told him that appellant was one of the people who shot him.

{¶4}     Ronald later went to the Youngstown Police Department to give an official statement about Javel's shooting to Detectives Sweeney and Barber.  In this statement, Ronald again said that Javel told him appellant was one of the people who shot him.  Detective Sweeney was never able to interview Javel because of the severity of his injuries.  Javel died on March 22, 2017 as a result of his gunshot wound.  At the time of appellant's trial, Javel's murder was unsolved.

{¶5}     On the same day Javel died, Ronald made a post on Facebook.  While the specific content of the post is unknown, the post had a threatening nature and indicated that Ronald was upset.

{¶6}     On the morning of March 24, 2017, Ronald was asleep in bed with his wife, Tracey Lewis, at their home.  Also present at the home was Ronald's sister, Sevalle Turner.  Sevalle was sleeping downstairs while Ronald and Tracey were in their room upstairs.

{¶7}     At about 6:00 or 6:30 a.m., Tracey was awoken by Ronald.  Tracey turned over to look at the clock at the foot of the bed.  When Tracey turned back towards the door, she saw two men standing in the bedroom doorway, each holding a gun.  Tracey started to scream.  Ronald turned around and the two men fired numerous gunshots striking both Ronald and Tracey.  Ronald sustained 17 gunshot wounds while Tracey sustained 13.  Ronald died as a result of the attack but Tracey survived.

{¶8}     Sevalle was in the downstairs bathroom when she heard the gunshots fired.  She opened the bathroom door and saw an African-American man dressed in black clothing wearing a mask and pointing a silver gun at her.  That man moved away from the door and a second African-American man approached the bathroom doorway pointing a black gun at her.  Neither man fired their gun or said anything to Sevalle.  Once the two men left, Sevalle called 911.

{¶9}     Officers Colleen Villio and Jeff Kay from the Youngstown Police Department were the first to arrive at the house.  They discovered Ronald and Tracey shot numerous times in the upstairs bedroom.  They heard Tracey faintly say that she was dying.  They also discovered that the kitchen door to the outside was propped open with a garbage can and the window by the kitchen sink was also open.  Finally, they discovered a ladder near the kitchen sink window.

{¶10}     Officers Villio and Kay were joined by Detective Donald Scott and Officer Greg Miller from the Youngstown Police Department.  Detective Scott took photographs and collected evidence, including shell casings and DNA swabs from the outside of the kitchen window.  They found both .45 caliber and 9 mm shell casings.

{¶11}     The DNA samples and shell casings were sent to the Bureau of Criminal Identification and Investigation (BCI) for analysis. Samuel Troyer, a BCI forensic scientist, conducted the DNA analyses on the DNA samples and the shell casings.  Troyer found DNA on one of the shell casings that belonged to a Jordan Kennedy.  Troyer also concluded that appellant's DNA was on the outside of the kitchen window.

{¶12}   During their investigation, Detectives Sweeney and Barber discovered that Jordan Kennedy was housed in the Mahoning County Justice Center awaiting trial on an unrelated charge.  At the time of the shooting, Jordan was incarcerated at the Mahoning County Justice Center and had been in the Justice Center since December of 2016.  Detectives Sweeney and Barber interviewed Jordan.  According to Jordan, he borrowed two guns from appellant prior to being incarcerated: a .45 caliber and a 9mm.  Shortly before being incarcerated, Jordan returned one of the firearms to appellant.  After being incarcerated, Jordan arranged for appellant to retrieve the second firearm from his girlfriend, Hydeia Hardin.

{¶13}   Detectives Sweeney and Barber then interviewed Hydeia.  She confirmed that appellant picked up a firearm from her along with some bullets while Jordan was incarcerated.

{¶14}   On November 30, 2017, a Mahoning County Grand Jury indicted appellant on nine counts: (1) aggravated murder in violation of R.C. 2903.01(A)(F), an unspecified felony; (2) aggravated murder in violation of R.C. 2903.01(B), an unspecified felony; (3) murder in violation of R.C. 2903.02(A), an unspecified felony; (4) attempted murder in violation of R.C. 2923.02 and R.C. 2903.02(A), a first-degree felony; (5) felonious assault in violation of R.C. 2903.11(A)(1)(D), a second-degree felony; (6) felonious assault in violation of R.C. 2903.11(A)(2)(D), a second-degree felony; (7) felonious assault in violation of R.C. 2903.11(A)(2)(D), a second-degree felony; (8) aggravated burglary in violation of R.C. 2911.11(A)(1)(B), a first-degree felony; and (9) intimidation of a witness in violation of R.C. 2921.04(B)(2)(D), a third-degree felony.  Appellant also faced firearm specifications pursuant to R.C. 2941.145 on counts one through eight.

{¶15}   Appellant filed a motion in limine seeking to exclude testimonial statements Ronald made to any officer of the Youngstown Police Department.  Two weeks later he filed another motion in limine seeking to exclude Jordan's testimony about Hydeia returning a firearm to appellant and testimony about appellant allegedly being involved in an armed robbery with Jordan.  The trial court denied both motions.

{¶16}   The matter proceeded to a jury trial.  The state dismissed the murder count and its accompanying firearm specification.  The jury found appellant guilty on all remaining counts.

Case No. 18 MA 0064

**{¶17}** At the subsequent sentencing hearing, the trial court merged appellant's convictions as follows: Count Two (aggravated murder plus a firearm specification) merged with Count One (aggravated murder plus a firearm specification); Counts Five and Six (felonious assault plus two firearm specifications) merged with Count Four (attempted murder plus a firearm specification); and Count Nine (witness intimidation) merged with Count Seven (felonious assault plus a firearm specification).

**{¶18}** The trial court sentenced appellant on each count as follows: life imprisonment without parole plus three years for the firearm specification on Count One, eleven years plus three years for the firearm specification on Count Four, eight years plus three years for the firearm specification on Count Seven, and eleven years plus three years for the firearm specification on Count Eight. The trial court ordered the sentences to run consecutively for a total of life imprisonment without parole plus 30 years, plus an additional 12 years for the firearm specifications.

**{¶19}** Appellant timely filed his notice of appeal on June 5, 2018. He now raises five assignments of error.

**{¶20}** Appellant's first assignment of error states:

THE INTRODUCTION OF UNFAIRLY PREJUDICIAL HEARSAY STATEMENTS OF RONALD LEWIS AND JAVEL BATES DURING APPELLANT'S TRIAL VIOLATED HIS RIGHT TO DUE PROCESS AND CONFRONTATION AS GUARANTEED BY THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND WAS CONTRARY TO THE OHIO RULES OF EVIDENCE.

**{¶21}** Appellant argues that Detectives Sweeney's and Barber's testimony about Ronald's statements, which were about statements made by Javel to Ronald, violated his right to confront witnesses or otherwise constituted inadmissible hearsay.

**{¶22}** Javel made statements to Ronald on March 8, 2017 about who shot him. Ronald relayed Javel's statements to Detective Sweeney at his house and later to Detectives Sweeny and Barber at the Youngstown Police Department. Detective Sweeney testified that, at Ronald's house, Ronald said that Javel said appellant was one

of the people who shot him. Ronald then went to the Youngstown Police Department for an interview with the detectives where Ronald again said that Javel told him appellant was one of the people who shot him. The detectives were not able to interview Javel because of Javel's condition and the fact that he died approximately two weeks after he was shot.

**{¶23}** There are three sets of statements admitted at trial that appellant argues violated his right under the Confrontation Clause or otherwise constituted inadmissible hearsay: Javel's statements to Ronald; Ronald's statements to Detectives Sweeney and Barber at Ronald's house; and Ronald's statements to Detectives Sweeney and Barber at the Youngstown Police Department. We will begin by analyzing whether the three sets of statements violated appellant's right under the Confrontation Clause.

**{¶24}** The Confrontation Clause prohibits the introduction of testimonial statements by a non-testifying witness (unless that witness is unavailable to testify and the defendant had a prior opportunity for cross-examination). *State v. Grabe*, 7th Dist. Mahoning No. 16 MA 0061, 2017-Ohio-1017, ¶ 20 citing *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**{¶25}** In determining if a statement is testimonial or not, courts apply the primary purpose test. See *State v. Carter*, 7th Dist. Mahoning No. 15 MA 0225, 2017-Ohio-7501. Prior to the United States Supreme Court decision in *Ohio v. Clark*, 576 U.S. 237, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015), Ohio used the primary-purpose test for evaluating whether statements made to law enforcement were testimonial and the objective-witness test for evaluating whether statements made to someone other than law enforcement were testimonial. But in *Clark*, the Court applied the primary-purpose test to a statement made to someone other than law enforcement. *Id.* The Court pointed out that in evaluating such a statement they should consider the statement in context noting that a statement made to non-law enforcement individuals is significantly less likely to be testimonial than a statement given to law enforcement. *Id.* at 2182.

**{¶26}** A "statement is testimonial if the circumstances objectively indicate there is no ongoing emergency and the primary purpose of the interrogation is to establish past events potentially relevant to later criminal prosecution." *State v. Craig*, 7th Dist. Mahoning No. 18 MA 0102, 2020-Ohio-1102, ¶ 35, citing *Hammon v. Indiana*, 547 U.S.

813, 822, 26 S.Ct. 2266, 165 L.Ed.2d 224 (2006).  But if the circumstances objectively indicate the primary purpose of the interrogation was to aid police to assist in an ongoing emergency, then the statement is non-testimonial and does not fall within the scope of the Confrontation Clause.  Id. at ¶ 36-37, citing *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

**{¶27}**  Beginning with Javel's statements to Ronald, the testimony at trial indicated that Javel was at Ronald's house on March 8, 2017 and then left.  When Javel returned later the same day, Javel's car had numerous bullet holes and Javel was suffering from a gunshot wound.  Javel informed Ronald that there was an altercation and appellant was one of the people who shot him.

**{¶28}**  With this statement, Javel was not attempting to create an out-of-court substitute for trial testimony.   Javel was informing Ronald about the circumstances surrounding his gunshot wound.  Statements about assaults to family members or friends are generally non-testimonial statements.  *Craig*, supra, at ¶ 63.  Therefore, Javel's statement to Ronald was non-testimonial.

**{¶29}**  Next, there is Ronald's statement to Detective Sweeney at Ronald's house.  The testimony at trial indicates that Detectives Sweeney and Barber were dispatched to Ronald's house to investigate a felonious assault.  Upon arriving at Ronald's house, Detective Sweeney inspected Javel's car.  He then questioned Ronald about what happened to Javel in Detective Barber's presence.  Ronald was initially hesitant to talk to Detective Sweeney but eventually told Detective Sweeney that Javel said appellant shot him.

**{¶30}**  Detectives Sweeney and Barber responded to a felonious assault call at Ronald's house.  Upon arriving, they observed bullet holes and a large amount of blood in Javel's car.  Javel had been critically injured and had been transported to the hospital by ambulance.  Detective Sweeney then spoke to Ronald at the scene who told him that Javel said appellant was one of the people who shot him.  The detectives' testimony at trial indicated that they were involved in an ongoing emergency because the man or men who shot Javel were still at large in the community.  Detective Sweeney's questioning of Ronald had the primary purpose of ascertaining what happened to Javel, which at the time was an on-going emergency.  Therefore, Ronald's statement to Detective Sweeney

at Ronald's house was non-testimonial in nature. Because Ronald's statement was non-testimonial, its admission did not violate appellant's confrontation rights.

**{¶31}** Next, we turn to Ronald's statement to Detectives Sweeney and Barber at the Youngstown Police Department. After Detectives Sweeney and Barber completed their investigation at the house, they asked Ronald to come to the Youngstown Police Department to give an official statement.

**{¶32}** Ronald's statement to the detectives at the Youngstown Police Department was testimonial in nature. Detectives Sweeney and Barber had already investigated at the house. They were aware of the details surrounding Javel's shooting by the time Ronald gave this statement. They were not attempting to resolve an ongoing emergency. Instead, they were attempting to establish or prove a past act. As such, the admission of this statement violated appellant's confrontation rights.

**{¶33}** But the admission of Ronald's statement to detectives at the Youngstown Police Department was harmless error. Harmless error is "[a]ny error, defect, irregularity, or variance which does not affect substantial rights[.]" *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23 quoting Crim.R. 52(A). Harmless error shall be disregarded. *Id.* In this case, the admission of Ronald's statement to the detectives at the Youngstown Police Department was harmless error because it was identical to Ronald's statement to Detective Sweeney at Ronald's house. The evidence at trial indicated that in both statements, Ronald said that Javel told him appellant was one of the people who shot Javel. Having found that Ronald's statement at his house was non-testimonial, the admission of Ronald's statement to the detectives at the Youngstown Police Department did not affect appellant's substantial rights and, is therefore, harmless error.

**{¶34}** Having determined that Javel's statement to Ronald and Ronald's statement to Detective Sweeney at his house were non-testimonial, we must now determine the admissibility of these statements under the Ohio Rules of Evidence. *State v. Triplett*, 7th Dist. Mahoning No. 17 MA 0128, 2018-Ohio-5405, ¶ 91 citing *Ohio v. Clark*, 135 S.Ct. at 2180.

**{¶35}** The admission of evidence is within the discretion of the trial court and the court's decision will only be reversed upon a showing of abuse of discretion. *State ex rel.*

*Sartini v. Yost*, 96 Ohio St. 3d 37, 2002-Ohio-3317, 770 N.E.2d 584. This includes rulings on hearsay issues. *State v. Rupp*, 7th Dist. Mahoning No. 05 MA 0166, 2007-Ohio-1561, ¶ 78 citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151. Abuse of discretion implies that the court acted in an unreasonable, arbitrary, or unconscionable manner. *Sartini* at ¶ 21.

**{¶36}** Appellant argues that the above statements constitute inadmissible hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible at trial. Evid.R. 802.

**{¶37}** We begin with Javel's statement to Ronald. Javel's statement that appellant shot him meets two exceptions to the hearsay rule. It qualified as both an excited utterance and a present-sense impression.

**{¶38}** An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). A present-sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1).

**{¶39}** In this case, at the time Javel made the statement to Ronald, Javel had just recently been shot. Javel's statement to Ronald was about the startling event of him being shot while Javel was still under the stress of being shot. Therefore, Javel's statement to Ronald qualified as an excited utterance. Moreover, Javel made this statement soon after being shot while he was still bleeding and had yet to be transported to the hospital. Thus, the statement also qualified as a present-sense impression.

**{¶40}** Next, we address Ronald's statement to Detective Sweeney at his house. During oral argument, the state argued that Ronald's statement was not hearsay because it was not being offered for the truth of the matter asserted. Instead, the state argued that it was offered to show Ronald's state of mind in that he believed appellant had shot Javel.

**{¶41}** We find this argument persuasive. During the state's case-in-chief, the testimony indicated that Ronald believed appellant was the person who shot Javel. Whether appellant shot Javel or not was irrelevant. The day Javel died, Ronald was upset

and posted an angry and threatening message on Facebook. Two days after Ronald posted the Facebook message, Ronald was killed. Mark Hollinshead spoke to appellant a day or two after Ronald was killed. (Tr. 308). Appellant said, "I'm going to give my condolences to you about your boy and stuff, but he shouldn't have put that on Facebook." (Tr. 308).

**{¶42}** The statement from Ronald at his house was not offered to prove the truth of the matter asserted (that appellant shot Javel), it was offered to show that Ronald *believed* appellant shot Javel and how this belief affected Ronald. This led to Ronald posting a threatening message on Facebook, which then may have led to Ronald being killed. This theory is also supported by the fact that as of the date of trial, Javel's murder was still unsolved. (Tr. 200). Based on the above, the trial court did not abuse its discretion by permitting this statement because it was not hearsay.

**{¶43}** In conclusion, the statements from Javel to Ronald and then from Ronald to Detective Sweeney at Ronald's house were non-testimonial in nature. The statement from Ronald to Detectives Sweeney and Barber at the Youngstown Police Department was testimonial in nature but its admission was harmless error.

**{¶44}** As for the hearsay issues surrounding the statements, the trial court's admission of these statements was not an abuse of discretion because Javel's statement to Ronald qualified as an excited utterance and a present-sense impression and Ronald's statement to Detective Sweeney at Ronald's house was not hearsay.

**{¶45}** Accordingly, appellant's first assignment of error is without merit and is overruled.

**{¶46}** Appellant's second assignment of error states:

> THE INTRODUCTION OF UNFAIRLY PREJUDICIAL HEARSAY STATEMENTS DURING THE TESTIMONY OF MULITPLE WITNESSES VIOLATED APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND WAS CONTRARY TO THE OHIO RULES OF EVIDENCE.

**{¶47}** In addition to testimony regarding Ronald's statements, appellant argues that the trial court erred in permitting several other witnesses to testify about other hearsay statements. Appellant complains of numerous pieces of testimony from several witnesses in this assignment of error. He concedes that he did not object to all of the testimony at issue in this assignment of error.

**{¶48}** Testimony to which appellant objected is subject to the abuse of discretion standard of review previously set forth. As for testimony that was not objected to, it is subject to a plain error review. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108. Plain error is error that is obvious and, but for the error, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

**{¶49}** Appellant takes issue with portions of Detective Barber's testimony. As part of his investigation, Detective Barber interviewed Sevalle Turner, Jordan Kennedy, Hydeia Hardin, and Mark Hollinshead. Detective Barber testified about his interviews with each of these people. Appellant argues that Detective Barber's testimony about these interviews was hearsay. Appellant also argues that allowing Detective Barber to repeat testimony from these four witnesses created an unfairly prejudicial effect.

**{¶50}** Beginning with Detective Barber's interview with Mark Hollinshead, according to Mark, there was an ongoing feud between Javel and appellant. After Javel died, "Ron may have said something. He [Mark] was not specific about what he [Ronald] said, but he [Mark] did not know anything about Ronald Lewis' shooting, is what he told us." (Tr. 473). Detective Barber elaborated that Mark "didn't provide a specific, but what he was talking about was that Ron may have been saying something." (Tr. 473). Appellant objected to this answer. The trial court overruled the objection holding that the testimony was not used to prove the truth of what was told to Detective Barber but was used to explain what the detective did. (Tr. 473).

**{¶51}** Detective Barber continued that Mark told him that Ronald posted something on Facebook, but Mark did not remember what was posted specifically. (Tr. 474). Mark also told Detective Barber that Ronald was at a neighborhood in Youngstown and was possibly making threats. (Tr. 474). Appellant objected again but the trial court overruled the objection. (Tr. 474). It permitted the testimony for the limited purpose of

Case No. 18 MA 0064

allowing Detective Barber to explain what he did in the investigation. (Tr. 475). Detective Barber concluded his testimony about his interview with Mark by saying "Ron may have been up there saying something, but he [Mark] didn't provide specifics again or who it was directed to." (Tr. 475).

**{¶52}** Because appellant objected to this line of questioning, it is subject to an abuse of discretion review.

**{¶53}** Law enforcement officers may testify to out-of-court statements for the non-hearsay purpose of explaining the steps in their investigation. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, at ¶ 172, reconsideration denied, 152 Ohio St.3d 1468, 2018-Ohio-1796, 97 N.E.3d 503, and cert. denied, 139 S.Ct. 796, 202 L.Ed.2d 587 (2019). Testimony to explain an officer's investigation is admissible as non-hearsay if it meets three requirements: "(1) the conduct to be explained is relevant, equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) the statements do not connect the accused with the crime charged." *Id.*

**{¶54}** Detective Barber's testimony about Mark's statements meets these criteria. The detective's testimony regarding his conversation with Mark was explained as one of the steps Detective Barber took in his investigation. Additionally, Detective Barber stated that Mark could not recall any specific statements Ronald may have made. Finally, even if Ronald made some vague threats to one in particular, this did not connect appellant with the crime charged. Thus, Detective Barber's testimony regarding Mark's statements was non-hearsay.

**{¶55}** Moreover, Mark testified in this case. He stated that he spoke with appellant a day or two after Ronald was killed. According to Mark, appellant said, "I'm going to give my condolences to you about your boy and stuff, but he shouldn't have put that on Facebook." (Tr. 308). Mark said that appellant's statement meant that Ronald was "threatening something" on Facebook. (Tr. 308-309). Thus, the jury would have heard Mark's testimony regarding potential threats appellant had been making even if Detective Barber had not testified about these threats.

**{¶56}** Next, Detective Barber testified about his interview with Sevalle Turner. Sevalle is Ronald's sister, Javel's half-sister, and was in Ronald's home when Ronald

and Tracey were shot. After the shooting, Sevalle called Detective Barber multiple times inquiring about the investigation into Ronald's death. During one such call, Sevalle told Detective Barber that the two men in the house when Ronald was shot were wearing gloves. (Tr. 477). She also told the detectives that the men pointed their guns at her while she was in the bathroom. (Tr. 477). Sevalle did not recall if she heard a clicking sound, indicating that the guns were empty, when they were pointed at her. (Tr. 477). Sevalle could only see the eyes of the two men because they were wearing masks and described them as two black males. (Tr. 478).

**{¶57}** Appellant did not object to this line of questioning. As such, it is subject to a plain error review.

**{¶58}** Detective Barber's testimony about Sevalle's statements is hearsay pursuant to Evid.R. 801(C). Detective Barber testified about out-of-court statements from Sevalle that were offered in court to prove the truth of the matter asserted. Namely, they were offered to show that two men, one potentially being appellant, intimidated Sevalle or threatened to cause Sevalle serious bodily harm by pointing a gun at her immediately after shooting two people. Because this testimony is hearsay, the first prong of a plain error analysis is satisfied.

**{¶59}** But there is no indication that, but for this testimony, the outcome of appellant's trial would have been different. Sevalle testified at trial to the same events as Detective Barber. Had Detective Barber's testimony about his interview with Sevalle been excluded, the jury was still presented with the same testimony from Sevalle herself. Because Detective Barber's testimony about his interview with Sevalle did not affect the outcome of appellant's trial, it was not plain error to admit this testimony.

**{¶60}** Next, Detective Barber testified about his interview with Jordan Kennedy. Jordan was appellant's friend. (Tr. 481). At the time of Ronald's and Tracey's shooting, Jordan was incarcerated at the Mahoning County Justice Center. (Tr. 481). Jordan had been in possession of two firearms that belonged to appellant, a .45 caliber and a 9mm. (Tr. 481). The shell casings found at Ronald's house were from a .45 caliber and a 9mm. (Tr. 481). About one week before being incarcerated, Jordan returned one of the guns to appellant. (Tr. 482). After he was incarcerated, Jordan arranged for appellant to retrieve the second firearm from Hydeia Hardin. (Tr. 482).

**{¶61}** Appellant did not object to this line of testimony. As such, it is subject to a plain error review.

**{¶62}** Detective Barber's testimony as to what Jordan told him about the firearms was hearsay. It was offered to show that appellant was in possession of the same two types of firearms that were used to shoot Ronald and Tracey. But once again, there is no indication that but for this testimony the outcome of the trial would have been different. Jordan testified as to the same events as Detective Barber. Thus, the jury would have heard this evidence even without Detective Barber's testimony. As such, plain error does not exist with this line of testimony.

**{¶63}** Next, Detective Barber testified about his interview with Hydeia Hardin. According to Detective Barber, Jordan wanted Hydeia to return a gun to appellant. (Tr. 482). Hydeia told the detective that appellant picked up a gun from her. (Tr. 482).

**{¶64}** Appellant did not object to this line of testimony. As such, it is subject to a plain error review.

**{¶65}** This line of testimony is hearsay. This testimony shows a chain of events as to how Jordan's DNA was found on a shell casing at the scene of the shooting. This testimony was offered to show the truth of the matter asserted, namely, that Jordan's DNA was at the scene of the shooting because Hydeia gave appellant a gun and bullets that were in Jordan's possession.

**{¶66}** But the admission of this testimony did not affect the outcome of appellant's trial. Hydeia also testified at trial that Jordan arranged for appellant to meet her in order to retrieve the gun. (Tr. 291). Appellant came to Hydeia's home and retrieved the gun along with some bullets. (Tr. 292). Had Detective Barber not testified about his interview with Hydeia, the jury was still presented with the same testimony from Hydeia herself. Therefore, Detective Barber's testimony about his interview with Hydeia does not rise to the level of plain error.

**{¶67}** The jury would have heard all of the witnesses' testimony even without Detective Barber's testimony. The detective merely repeated what the witnesses themselves testified to as he explained each step he took in his investigation. Appellant has not demonstrated any prejudice as a result of this testimony.

{¶68} Appellant also argues that Detective Barber's testimony about these four interviews, when all four of these witnesses also testified at trial, created a substantial prejudicial effect. In support, he cites *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13 (11th Dist.). In *Butcher*, a mother, grandmother, and physician testified at trial regarding statements by two children that the appellant was sexually abusing them. On appeal, the court found these statements to be inadmissible hearsay and reversed the appellant's conviction due to the prejudice caused by the statements. The court noted that multiple adults, by way of inadmissible hearsay, testified that the appellant was the culprit. *Id.* at ¶ 78. It reasoned that when multiple adults repeat children's stories in court it makes the children's statements more believable. *Id.* at ¶ 79.

{¶69} The present case, however, is distinguishable from *Butcher*. In *Butcher*, the court found significant the fact that multiple adults repeated children's statements in court. This is not the case here. Moreover, in *Butcher*, the hearsay statements actually specifically identified appellant as the perpetrator of the sexual abuse. In this case, however, the repeated testimony appellant complains of does not explicitly identify him as the perpetrator of a crime. Thus, the prejudice present in *Butcher* is not present here.

{¶70} The trial court did not abuse its discretion by permitting Detective Barber to testify about his interviews with Mark, Sevalle, Jordan, and Hydeia.

{¶71} Next, appellant argues that it was improper for the trial court to entertain testimony about Ronald's Facebook post. Appellant argues that mentioning Ronald's Facebook post was hearsay. Three witnesses testified about this Facebook post: Detective Barber, Mark Hollinshead, and Gary Benjamin. As Detective Barber's testimony about this Facebook post was already addressed in this assignment of error, we need not reanalyze it.

{¶72} Mark spoke with appellant a day or two after Ronald was killed. Appellant told Mark "I'm going to give my condolences to you about your boy and stuff, but he shouldn't have put that on Facebook." (Tr. 308). Mark said that appellant's statement meant that Ronald was "threatening something" on Facebook. (Tr. 308-309).

{¶73} Gary Benjamin, Ronald's childhood friend, went to Ronald's house on March 23, 2017, the night before Ronald was killed. Gary went to Ronald's house to calm

Ronald down after Ronald's Facebook post. Ronald was "irate" because Javel had died the previous day, March 22, 2017. (Tr. 391).

**{¶74}** While there was testimony that Ronald made a post on Facebook, there is no testimony as to what Ronald's post actually said. Mark and Gary never specified what this post contained. Similarly, Detective Barber testified that Mark never specified what the post said. As such, there is no statement from Ronald in this instance.

**{¶75}** Accordingly, appellant's second assignment of error is without merit and is overruled.

**{¶76}** Appellant's third assignment of error states:

> APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO IMPERMISSIBLE HEARSAY EVIDENCE, IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

**{¶77}** Appellant argues that his trial counsel's failure to object to the evidence complained of in his first two assignments of error constitutes ineffective assistance of counsel.

**{¶78}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95 citing *Strickland.*

**{¶79}** Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

**{¶80}** For the reasons previously set forth in appellant's first and second assignments of error, the majority of the testimony appellant complains of was properly admitted. As for the testimony that was improperly admitted, that testimony did not have

a prejudicial effect on appellant's trial. As such, appellant's trial counsel was not ineffective.

**{¶81}** Accordingly, appellant's third assignment of error is without merit and is overruled.

**{¶82}** Appellant's fourth assignment of error states:

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION.

**{¶83}** Appellant makes numerous arguments in this assignment of error but they all center on the general argument that there was no direct evidence that he was ever inside Ronald's house at the time of shooting.

**{¶84}** The claim that a verdict is against the manifest weight of the evidence concerns whether a jury verdict is supported by "the *greater amount of credible evidence*." (Emphasis sic.); *State v. Merritt*, 7th Dist. Jefferson No. 09 JE 26, 2011-Ohio-1468, ¶ 45 quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The reviewing court weighs the evidence and all reasonable inferences and considers the credibility of the witnesses. *Thompkins* at 387. Although the appellate court acts as the proverbial "thirteenth" juror under this standard, it rarely substitutes its own judgment for that of the jury's. *Merritt* at ¶ 45. This is because the trier of fact was in the best position to determine the credibility of the witnesses and the weight due the evidence. *Id.* citing *State v. Higinbotham*, 5th Dist. Stark No. 2005CA00046, 2006-Ohio-635.

**{¶85}** "Only when 'it is patently apparent that the factfinder lost its way,' should an appellate court overturn the jury verdict." *Id.* citing *State v. Woullard*, 158 Ohio App.3d 31, 2001-Ohio-3395, 813 N.E.2d 964 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins* at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 36 quoting Ohio Constitution, Article IV, Section 3(B)(3).

Case No. 18 MA 0064

**{¶86}** Appellant is correct that no witnesses identified him as one of the shooters at Ronald's house on March 24, 2017. There were two eyewitnesses who testified at trial: Sevalle Turner and Tracey Lewis. Sevalle testified that the shooters were wearing masks and she could only see their eyes. Sevalle only described the shooters as thin African-American men. Tracey could not give a description of the shooters other than they were wearing black clothing.

**{¶87}** The state relied on circumstantial evidence to identify appellant as one of the shooters. Officer Miller, one of the evidence collection officers, concluded that the point of entry into the house was the kitchen window due to: the window being open, the blinds on the window being disturbed, and the window's screen being removed and laying on the inside of the house. (Tr. 337-338). Appellant's DNA was found on the outside of the kitchen window. (Tr. 445).

**{¶88}** Additionally, Jordan Kennedy's DNA was found on one of the shell casings inside Ronald's house. (Tr. 443). Jordan was incarcerated in December of 2016 and was still incarcerated at the time of the Lewis' shooting. Prior to being incarcerated, Jordan was in possession of two of appellant's guns: a P94 Ruger 9mm and a Hi-Point .45 caliber. (Tr. 271). About a week before being incarcerated, Jordan returned one of the guns to appellant. (Tr. 482). While he was incarcerated, Jordan arranged for appellant to receive the other gun from Hydeia. (Tr. 272-273). Hydeia returned the other gun to appellant along with a "bag of bullets[.]" (Tr. 291-292). The shell casings found at Ronald's house were for a .45 caliber and a 9mm. (Tr. 343-344).

**{¶89}** Appellant contends that this evidence does not indicate that he was one of the shooters. Troyer testified on cross-examination that, when it comes to touch DNA or "shedding," he cannot differentiate between primary transfer of DNA (when a person touches an object and that person's DNA is on the object) or secondary transfer of DNA (when person A touches person B, person B then touches an object, and person A's DNA is on the object). (Tr. 448-449). Appellant also points out Detective Barber's testimony that, according to Sevalle Turner, the two shooters were "thin built." (Tr. 498-499). Detective Barber does not consider himself thin built and appellant is a bigger person than Detective Barber. (Tr. 499).

**{¶90}** The state counters that appellant's conviction was not against the manifest weight of the evidence because his DNA was on the window of Ronald's house. In support of this argument, the state cites *State v. Eckard*, 3d Dist. Marion No. 9-15-45, 2016-Ohio-5174.

**{¶91}** In *Eckard*, Eckard was convicted by a jury of burglary. *Id.* at ¶ 2-5. He appealed arguing that his conviction was insufficient as a matter of law and his conviction was against the manifest weight of the evidence. *Id.* at ¶ 6. The basis of his argument was that no witness testified at trial that he was the person who committed the offense. *Id.* at ¶ 7, 11. The only evidence that implicated Eckard was a crowbar at the scene of the burglary. *Id.* at ¶ 14-15. A DNA profile was found on the crowbar and analysis indicated Eckard was the major contributor. *Id.* at ¶ 22. With regard to the manifest weight challenge, the Third District held that "because Eckard's DNA was found on the crowbar that was found at the crime scene, it was permissible for the jury to infer a link between Eckard and the crime scene." *Id.* at ¶ 39. The Third District went on to hold that the fact the state's witnesses did not identify Eckard as the perpetrator was a matter for the trier of fact to weigh. *Id.* citing *State v. Williams*, 10th Dist. Franklin No. 10AP-779, 2011-Ohio-4760.

**{¶92}** The state also cites this court's decision in *State v. Walenciej*, 7th Dist. Jefferson No. 07 JE 6, 2007-Ohio-7206. In *Walenciej*, this court held that, in a manifest weight challenge, "[w]hen there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed." *Id.* at ¶ 47.

**{¶93}** Applying *Eckard* and *Walenciej*, the jury's determination that appellant was one of the shooters was not against the manifest weight of the evidence. A reasonable view of the evidence produced at trial was that appellant's DNA was on the outside of the window because he was one of the shooters who entered Ronald's house through the window. Similarly, a reasonable inference for Jordan's DNA on one of the bullet casings is because the guns and bullets used during Ronald's and Tracey's shooting were the ones that Jordan gave appellant. This is also supported by the fact that Jordan testified that the guns he gave appellant were the same caliber of shell casings found at the house (a .45 caliber and a 9mm).

Case No. 18 MA 0064

**{¶94}** Next, appellant argues that the testimony about Ronald's Facebook post was not indicative of his guilt. While there was no testimony about exactly what Ronald posted on Facebook, there was testimony suggesting that it was threatening in nature and that Ronald's post showed he was angry. While this evidence may not have directly implicated appellant, the other evidence (including appellant's DNA at scene, the evidence regarding the firearms, and the evidence that Ronald believed appellant shot Javel), was enough to sustain the jury's verdict.

**{¶95}** Finally, appellant specifically argues that his conviction for felonious assault against Sevalle Turner was against the manifest weight of the evidence. Felonious assault is defined as, among other things, knowingly cause or attempting to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2).

**{¶96}** Appellant argues that there was no evidence that either of the shooters caused or attempted to cause Sevalle harm. The evidence produced at trial showed that, after Ronald and Tracey Lewis were shot, the shooters found Sevalle in the house and pointed their guns at her. Neither of the shooters said anything nor shot Sevalle.

**{¶97}** The state cites two cases: *State v. Green*, 58 Ohio St.3d 239, 569 N.E.2d 1038 (1991), and *State v. Gilbert*, 7th Dist. Mahoning No. 08 MA 206, 2012-Ohio-1165. In *Green,* the Ohio Supreme Court held that "the act of pointing a deadly weapon at another coupled with a threat, which indicates an intention to use such weapon, is sufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)." *Green* at 241. In *Gilbert*, this court held that, in felonious assault cases, the defendant's intent to cause physical harm may be inferred from his actions under the circumstances. *Gilbert* at ¶ 31.

**{¶98}** If we infer appellant's intent from the actions under the circumstances, this conviction for felonious assault was not against the manifest weight of the evidence. Appellant shot two people numerous times moments before encountering Sevalle. Appellant and the other shooter then both pointed their guns at Sevalle. The circumstances indicate that appellant was willing to shoot Sevalle because (1) he had previously fired his gun numerous times in the house Sevalle was in and (2) he pointed his gun directly at Sevalle moments after shooting two people numerous times. While there was no verbal threat, the circumstances in this case indicate that there was a non-

verbal threat to cause Sevalle severe bodily harm. Thus, appellant's conviction for felonious assault against Sevalle was not against the manifest weight of the evidence.

**{¶99}** Accordingly, appellant's fourth assignment of error is without merit and is overruled.

**{¶100}** Appellant's fifth assignment of error states:

> THE TRIAL COURT ERRED BY NOT PROPERLY INSTRUCTING THE JURY REGARDING ATTEMPT, WHICH PREJUDICED APPELLANT AND VIOLATED HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

**{¶101}** Appellant argues that the trial court incorrectly instructed the jury on attempt.

**{¶102}** After the jury instructions, the trial court had a discussion with both counsel off the record. At the conclusion of that discussion, the trial court noted that "there are no issues regarding the charge[.]" (Tr. 599). The failure to object to improprieties in the jury instructions waives all but plain error. *State v. Triplett*, 7th Dist. Mahoning No. 17 MA 0128, 2018-Ohio-5405, ¶ 34, quoting *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983).

**{¶103}** During jury instructions, the trial court instructed the jury on, among other things, aggravated burglary, attempted murder, and felonious assault. (Tr. 576-579). The first instruction of attempt was during the aggravated burglary instruction. The trial court defined "attempt" pursuant to R.C. 2911.11(A)(1) as "simply an unsuccessful try[.]" (Tr. 578). During the attempted murder instruction, the trial court noted that attempt has "already been defined for you[.]" (Tr. 581). During the felonious assault instruction, the trial court defined attempt as "he wasn't able to do it, but he tried to do it[.]" (Tr. 584).

**{¶104}** Appellant argues this is an oversimplification of the definition of attempt. Pursuant to R.C. 2923.02(A), attempt is defined as "conduct that, if successful, would constitute or result in the offense."

**{¶105}** The trial court's instructions on attempt, while not word-for-word recitations of R.C. 2923.02(A), are not misleading or an oversimplification as appellant argues. The trial court's instructions of attempt being "an unsuccessful try" and of appellant trying to

do it but not being able both fit the Revised Code definition of "conduct that, if successful, would constitute the offense." As such, there is no obvious error regarding the trial court's instruction of attempt and, therefore, no plain error.

**{¶106}** Accordingly, appellant's fifth assignment of error is without merit and is overruled.

**{¶107}** For all of the foregoing reasons, the trial court's judgment is hereby affirmed.

Robb, J., concurs.

D'Apolito, J., concurs.

[Cite as *State v. James*, 2020-Ohio-4289.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**