[Cite as *State v. Ryan*, 2019-Ohio-5339.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108143 |
| v. | : | |
| TREVOR RYAN, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 26, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-607638-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin E. Bringman, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Robert Blanshard McCaleb, Assistant County Public Defender, *for appellant.*

LARRY A. JONES, SR., J.:

{¶ 1} Defendant-appellant Trevor Ryan ("Ryan") appeals his convictions for felonious assault and kidnapping, which were rendered after a bench trial. For the reasons set forth below, we affirm.

**Factual and Procedural History**

{¶ 2} The incident giving rise to this case occurred in June 2016, when, by Ryan's own admission, he assaulted the victim, his then-girlfriend. In July 2016, a Cuyahoga County Grand Jury indicted Ryan with one count each of felonious assault, domestic violence, and kidnapping. After the bench trial, the trial court found him guilty on all counts and sentenced him to an aggregate three-year prison term. The following facts were adduced at trial.

{¶ 3} At the time of the incident, the victim and Ryan were, as mentioned, dating; they were living together. The victim was employed as a dancer at the Hustler Club, a downtown Cleveland male entertainment club. The victim worked the night of the incident; Ryan dropped her off, went out downtown for a little while, and then returned to the Hustler Club near the end of her shift.

{¶ 4} The victim testified that when Ryan returned to the club, he started talking to an old friend of hers, Rodney. Everything appeared to be fine, and at the end of her shift, the victim left the patron area to go to a dressing room to get changed. As soon as she left the patron area, she received text messages from Ryan accusing her of sleeping with Rodney.

{¶ 5} The victim got dressed and went outside to find Ryan. Ryan pulled up in the car and she got in. She testified that as soon as she got in the car, Ryan yelled at her and assaulted her. According to the victim, Ryan continuously assaulted her; first he grabbed her head and hit it against the passenger side window, and then he grabbed her by her throat. She testified that it was as if Ryan "wanted

to hurt [her], but didn't want to break the window." And he was driving in an "insane" manner: she testified that Ryan "was trying to beat me up with the car, not just his hands. * * * [he was] slamming on the brakes, trying to get around other cars, trying to go fast." She testified that at one point, she grabbed on to the dashboard so hard that she broke part of the plastic pieces to the vent. The victim testified that she repeatedly tried to get out of the car, but Ryan would speed up and make it impossible. Ryan was driving on West 25th Street, where there were groups of people outside of bars and restaurants. She was dismayed that no one attempted to help her.

{¶ 6} According to the victim, Ryan got on the highway, and unsuccessfully attempted to throw her out of the car. During the course of driving, Ryan hit the emergency brake on the car and he had to get off the highway. He was still assaulting the victim; a bystander saw, and confronted Ryan. Ryan got out of the car, and the victim got into the driver's seat and drove away.

{¶ 7} The victim testified that during the assault she lost consciousness three times: as soon as Ryan attacked her upon getting into the car, when he was driving on West 25th Street, and when the bystander was yelling at Ryan. During each of those episodes, Ryan held his hand to her throat, which caused her to lose consciousness. She also testified that she urinated on herself during the assault.

{¶ 8} After she took control of the car, the victim drove back to the Hustler Club. A friend at the club drove her to MetroHealth Hospital. The victim described her experience at MetroHealth as the "worst experience I've ever had in my whole

life." She testified that she was in a "hallway laying next to a gunshot victim who literally had a bullet taken out of their leg like it was nothing in the hallway." She spoke with a social worker, but no medical professional treated her. The social worker's record indicated that the victim told her that she had been "choked" and "strangled."[1] The records further stated that the victim had "bruises all over her body, swelling around the neck, and finger marks and scratches on the arms and shoulders."

{¶ 9} According to the victim, Ryan texted her while she at MetroHealth, and despite her being "110 percent" sure that she never told him where she was, he arrived at MetroHealth. Initially, he was outside, but he eventually came into the hospital. Although the hospital personnel would not allow Ryan to come into the hallway area where she was, the victim testified that she was scared because he was there and the officers on duty told her that they could not arrest him or make him leave.

{¶ 10} The victim testified that, because of the situation, she called the police while she was at the hospital, told them that Ryan was there, she needed help, and she was coming in to a station. She left MetroHealth Hospital and her friend drove

---

[1] We note that the words "choked" and "strangled" were sometimes used interchangeably by the parties and witnesses. One of the medical professionals who testified — a Sexual Assault Nurse Examiner ("SANE nurse") from Fairview Hospital — explained that they are two different occurrences, however. Specifically, choking is internal and could occur for example if one's airway was blocked by food. Strangulation on the other hand is external pressure on the outside of the neck. It could be caused, for example, as occurred here, by one having a hand placed on their neck with enough pressure to restrict the airway.

her to a police station; she stayed on the phone with the 911 dispatcher until she arrived at the station and made a statement.

{¶ 11} The victim told the police that Ryan had "strangled" her and that she may have passed out for a few seconds. One of the police officers that she met with told her that he thought she had a concussion, so she had another friend take her to Lakewood Hospital, where she was told that she had a head trauma that needed to be treated at a trauma center, which Lakewood Hospital was not. The medical records from Lakewood Hospital indicated that the victim had a "concussion without loss of consciousness." Because of Lakewood Hospital's lack of a trauma center, the victim was transported to Fairview Hospital, where she was examined and photographed by a SANE nurse. The records from Fairview Hospital indicated that the victim told the hospital personnel that she lost consciousness for an unknown amount of time. The discharge notes stated that she suffered a "possible concussion."

{¶ 12} On cross-examination, the victim admitted that she did not mention to any of the hospital personnel at MetroHealth Hospital, the first hospital she went to, that she had lost consciousness. She explained that she had "victim's remorse," and was trying to protect Ryan.

{¶ 13} A paramedic nurse from MetroHealth testified. She was working at the time the victim came in. She explained that she was the first encounter for "anyone who comes through [the emergency department] door, whether they're a patient or a visitor." If the person coming in was a patient, she would assess how

emergent the patient's needs were, and if the person was a visitor she would assess whether the person should be granted visitation. The nurse testified that, unless there is a reason, she would not put any documentation of a visitor in the corresponding patient's chart.

{¶ 14} However, she would put documentation in the patient's chart if the patient specifically noted that he or she wished to see a particular visitor or not, if the patient had a general "no visitor" request, or if the visitor exhibited some type of behavior that she believed would pose a risk to the patient, other patients, or the hospital staff. She encountered Ryan that evening and made a notation about him on the victim's chart.

{¶ 15} Specifically, the paramedic nurse noted that the victim requested that Ryan not be permitted visitation. Ryan came to the emergency room and asked to see the victim; she told him no. She testified that he was "agitated," but left without incident.

{¶ 16} One of the police officers who met with the victim on the date of the incident, Officer Melissa Marquard ("Officer Marquard"), also testified. She described the victim as crying, sad, fearful, and "almost embarrassed." Officer Marquard testified that the victim was "covered in marks on her arms, her chest, her face. There was — her, I believe it was, left eye was completely black and blue. She had a cut on the top of her head, scratch marks on her neck." The officer suggested that the victim seek medical attention and advised her to make changes to her living

arrangement. She referred the case to the detective bureau for a domestic violence investigation.

{¶ 17} The SANE nurse from Fairview Hospital testified. She explained that her job is not limited to examining victims of sexual assault; she also examines victims of domestic and interpersonal violence. She testified that she had recently had training in strangulation. The nurse testified that there are "usually not very many visible injuries to the outside of the neck" when a person is strangled. Therefore, medical professionals look for other signs, such as a fractured hyoid bone, fractured tracheal cartilage, loss of control of bowel or bladder, loss of consciousness, loss of voice, or hoarseness of voice. She described strangulation to the neck as "very serious."

{¶ 18} The victim told the SANE nurse that Ryan was mad at her and so he hit her head up against the car window and "choked" her. The victim told the nurse Ryan went "crazy." The victim said that the assault started as soon as they got into the car, that he continued even when he got on the highway, he tried to throw her out of the car, and said he was going to kill her.

{¶ 19} The victim told the nurse that Ryan "choked" her to the point that she passed out and she urinated on herself. The nurse testified that the victim urinating on herself "goes to show there was a loss of consciousness." The nurse further testified that some of the victim's visible injuries were consistent with strangulation and that some of the visible injuries were indicative of self-inflicted defensive injuries.

**Law and Analysis**

{¶ 20} As mentioned, Ryan admits that he assaulted the victim, with whom he was living at the time and, therefore, that he committed an act of domestic violence against her. As such, he is not now challenging that conviction. Rather, in his sole assignment of error, Ryan contends that his felonious assault and kidnapping convictions were against the manifest weight of the evidence.

{¶ 21} The criminal manifest-weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Under the manifest-weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000).

{¶ 22} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

{¶ 23} In evaluating a challenge to the verdict based on the manifest weight of the evidence in a bench trial:

> [T]he trial court assumes the fact-finding function of the jury. Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 16 (8th Dist.), citing *Thompkins* at *id.* Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at *id.*, quoting *Martin* at *id.*

{¶ 24} According to Ryan, the victim's testimony was "extremely difficult to credit." Ryan specifically takes aim at the victim's testimony that he strangled her to the point of unconsciousness three times, testimony that the state relied on to support the "serious physical harm" element of felonious assault. In regard to his kidnapping conviction, Ryan contends that the victim's testimony that his conduct was meant to terrorize her was unbelievable. According to Ryan, her claim lacks the "certainty and believability to sustain a criminal conviction."

{¶ 25} Upon review, this is not an exceptional case in which the evidence weighs heavily against the conviction. In regard to the victim's claim of losing consciousness, Ryan contends that the first time she mentioned that it occurred three times was at trial, which, according to him, discredits her testimony. We disagree.

{¶ 26} The record establishes that at the time of the incident, the victim reported at the police station and Fairview Hospital that she was "choked" or "strangled" to the point of losing unconsciousness. Prior to trial, she never quantified how many times the strangulation caused her to lose consciousness — but it is not, for example, a case where she initially reported that it only happened once and then later at trial testified that it happened three times. There was no inconsistency. It is not incredible that in the thick of the moment, she did not report the specific details about the assault; rather, she was attempting to seek help and treatment in general. We find her testimony credible. That being said, it is established that strangling a person to the point of unconsciousness is serious physical harm. *State v. Dozier*, 5th Dist. Stark No. 2016CA00114, 2017-Ohio-4173, ¶ 31; *State v. Chambers*, 8th Dist. Cuyahoga No. 99864, 2014-Ohio-390, ¶ 19, 23; *State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 37-38; *State v. Smith*, 9th Dist. Summit Nos. 23468 and 23464, 2007-Ohio-5524, ¶ 27.

{¶ 27} We likewise do not find the victim's testimony relative to the kidnapping conviction to be incredible. Although she initially voluntarily got into the car with Ryan, she testified that she attempted to get out after he started assaulting her, but he would speed up, making it impossible for her to do so. The record shows that Ryan restrained her of her liberty for the purpose of terrorizing her and inflicting serious physical harm on her. In fact, a neutral bystander witnessed it and confronted Ryan, which led to the victim being able to escape.

**{¶ 28}** In light of the above, there is no merit to Ryan's sole assignment of error and it is overruled.

**{¶ 29}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

EILEEN T. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR