[Cite as *State v. Staken*, 2022-Ohio-2680.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,             :

                              No. 111088

    v.                              :

QUENTIN STAKEN,                         :

    Defendant-Appellant.            :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 4, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-655185-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Kristen Hatcher, Assistant Prosecuting
Attorney, *for appellee.*

VanHo Law and Adam M. VanHo, *for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant Quentin Staken ("Staken") appeals his conviction and sentence and asks this court to remand to the trial court for further proceedings. We affirm Staken's conviction and sentence.

{¶ 2} Staken was found guilty after a bench trial of the following:

One count of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(A)(1);

One count of robbery, a second-degree felony, in violation of R.C. 2911.02(A)(1);

One count of robbery, a second-degree felony, in violation of R.C. 2911.02(A)(2);

One count of felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1);

One count of assault, a first-degree misdemeanor, in violation of R.C. 2903.13(A);

One count of theft, a fifth-degree felony, in violation of R.C. 2913.02(A)(1);

One count of theft, a first-degree misdemeanor, in violation of R.C. 2913.02(A)(1); and

One count of misuse of credit cards, a first-degree misdemeanor, in violation of R.C. 2913.21(B)(2).

Journal entry No. 119342644 (Nov. 3, 2021). In addition, he was found guilty of the one- and three-year firearm specifications attached to the aggravated robbery, robbery, and felonious assault counts pursuant to R.C. 2941.141(A) and R.C. 2941.145(A).

{¶ 3} For the purpose of sentencing, Counts 1, 2, and 3 merged; Counts 4 and 5 merged; and Counts 6, 7, and 8 merged. The trial court sentenced Staken to four years' incarceration for aggravated robbery; three years' incarceration for felonious assault; and six months' incarceration for theft and misuse of credit cards.

The trial court also imposed three-year firearm specifications for aggravated robbery and felonious assault. The trial court ordered the terms of incarceration to run concurrently and the terms for the firearm specification to be served consecutively. In total, Staken was sentenced to ten years of incarceration.

## I.     Facts and Procedural History

{¶ 4} On October 13, 2020, Jennifer Helms ("Helms") was walking towards the door to her home sometime before midnight. Helms observed three people coming towards her driveway and was approached by one of them. All three individuals were wearing face masks and hoods, and one of them asked Helms for her internet password. Helms replied that she did not have one, and the individual pulled out a gun and started walking closer to Helms. The individual demanded that Helms hand over whatever she had, and as she went to take her purse off of her shoulder, the individual, who Helms described as a black man, struck Helms in the back of the head three or four times with the gun. No one else was holding a gun but the man who struck Helms.

{¶ 5} Helms fell to the ground, and she handed her purse to another individual, who told Helms to "do what he says." (Tr. 84.) Helms's wallet was in her purse and it contained cash, her driver's license, and several credit cards. Helms's keys were still in her hands and one of the individuals tried to pull the keys out of her hand. They managed to snatch the house key, but Helms hid her car key, and pretended to throw it. The individual with the gun went to look for the key, and

Helms ran to her house, which was unlocked. Her husband was home, but asleep, and Helms screamed for him. Helms's husband took her into their bathroom where they observed Helms bleeding, and blood was on her dress and in her hair. Helms's husband called 911.

{¶ 6} Officer Thomas Smith ("Officer Smith") responded to the 911 call and took Helms's statement. Officer Smith noticed a gash on Helms's head, and Helms shared a description of the three assailants with Officer Smith. Officer Smith alerted other police officers who were in the area looking for the suspects. Helms described one black man and two white women. Officers found Helms's purse on the ground but the contents and her cell phone were not located. Later, Helms was treated at the hospital for her head wound.

{¶ 7} After the incident and while on patrol, Officer Carlos Guerra ("Officer Guerra") received a description of the assailants. He encountered a woman matching the description that told Officer Guerra she, another woman, and a man were looking for Wi-Fi. She told Officer Guerra that the man's name was Cash. Officer Guerra reported the information, and the woman was identified as Kaylee Reese ("Reese").

{¶ 8} Helms and her husband reported to Detective Daniel Florentz ("Detective Florentz") that they noticed several unauthorized charges on one of the stolen credit cards. They provided Detective Florentz with a list of places where the card was used. Detective Florentz obtained video surveillance from those locations

including Walgreens and an RTA Rapid Station. Detective Florentz used the information from Officer Guerra's interview with Reese to investigate Cash, who was later identified as Staken. Detective Florentz learned that Staken was involved in a burglary with Caroline Montgomery ("Montgomery"). Detective Florentz showed Montgomery the video surveillance footage, and she identified her granddaughter, Ysabella Montgomery ("Ysabella") and Staken, who were dating.

{¶ 9} Ysabella and Staken were on several surveillance videos using Helms's credit card. Detective Florentz prepared a photo lineup with Staken's picture and showed it to Helms. Helms identified another man in the lineup with 50% certainty because it was dark and rainy the night of her assault. Despite this, Staken was arrested and his bedroom was searched.

{¶ 10} The police found a black backpack, a BB gun, and a couple of firearm magazines loaded with ammunition. During an interview with the police, Staken admitted to being in Helms's driveway during the time of the incident, but claimed that Ysabella did everything including hitting Helms with a .38 pistol. He also stated to police that he may have had the credit card and might have bought some stuff. Detective Florentz testified that these statements were inconsistent with Staken's prior statements where Staken claimed to not have any knowledge of the incident.

{¶ 11} On October 4, 2021, the state filed a motion asking the court to allow Helms and her husband to testify remotely via live videoconferencing. On October 14, 2021, the trial court held a hearing regarding the state's motion and

granted the motion. Journal entry No. 119061936 (Oct. 14, 2021). During the hearing on the motion the state in its opening statement explained:

> Specifically in this case, Mr. and Mrs. Helms they do live in Pennsylvania approximately 6 hours away from here. They have traveled out here some time previously when trial was set. Travel out here does require them to bring their three children. Specifically Mr. Helms takes vacation from work. They have to arrange someone to watch their children when they are in town. It is a significant inconvenience to them. They do have, as I understand, limited time. Both of them are present via Zoom today and can testify to those facts.

(Tr. 21.)

{¶ 12} Helms and her husband testified at the hearing that they live in Harrisburg, Pennsylvania, and that the drive time from their home to Cleveland is six hours. The trial had been previously scheduled and rescheduled earlier in the year, and the Helms drove to Cleveland, but the trial was postponed and rescheduled. Mr. Helms testified that he had to take time off from work and that he had limited vacation hours because he started his current job four months prior to this hearing. He also testified that he had to find lodging in Cleveland that would be able to accommodate his three children, in addition to childcare for the children, because they do not have family in Cleveland.

{¶ 13} Helms testified after her husband and her testimony was similar to that of Mr. Helms. She explained to the court that she was a stay-at-home mother who homeschooled her children, ages eight, seven, and five. Helms testified as to the difficulty it would be to make the drive from Harrisburg to Cleveland.

{¶ 14} During closing, the state explained to the court that

> [t]his wouldn't infringe on Mr. Staken's rights; they're very clearly visible. Their demeanor can be assessed, their face can be assessed. Causing them to travel not only would be a great difficulty to them; but with COVID right now we're asking them to bring three children from out-of-state in here, bring them into the courthouse. It just increases the risk of spread, and again I do not think that this would infringe on his rights at all as they can be clearly seen and the jury would be able to clearly assess their credibility.

(Tr. 36.)

{¶ 15} After the closing arguments, the trial court engaged in a series of questions between the court, the state, and Staken's counsel. The trial court inquired as to whether or not Ysabella was going to testify that she saw Staken assault and rob Helms. The trial court also inquired about whether or not there was a disagreement that something happened to Helms in her driveway and that her husband called 911. Staken's trial counsel informed the court that the issue was that the state could demonstrate beyond a reasonable doubt that Staken was involved with the incident that happened at the Helmses' home, not that the incident did not actually occur.

{¶ 16} In response to Staken's trial counsel's admission the trial court stated:

> And here's why I'm asking that, because I think one of the things that has to be taken into account when deciding whether remote testimony is acceptable are the necessities of the case. And based on what I'm hearing, it's pretty clear that Ms. Helms was victimized. Whether she was victimized by Staken is obviously another question; and I don't make any conclusions on that subject, but it's pretty clear that something happened to her. And Montgomery will more or less confirm that something happened because Montgomery admits to

being there putting aside, again, Staken's own involvement. And so in considering this — and I'm not ready to rule — but one of the things I think I will consider is Ms. Helms. She is a complainant against Staken, but she does appear to be in fact a victim. Not necessarily Staken's victim, because he's presumed innocent, but a thing happened to her where she was victimized. And so having already made the trip once and been thwarted because of the Court's schedule, can I take that into account in considering the necessities of the case in deciding the particular motion? So that's why I'm asking you these questions. And I may have not spelled that out as articulately as I wished, but it's because I'm trying to let you know why I'm asking these questions in the first place; is there any real debate whether something happened to Ms. Helms that night? And it sounds to me like there isn't, and the question is who did this essentially.

(Tr. 45-46.)

{¶ 17} The trial court explained that while Staken had a constitutional right to confront his accuser, Helms was not in fact accusing him because she was uncertain about who attacked her. Helms just knew that it was a black man. The person who accused Staken was Ysabella, and the trial court ensured that she would testify in person. The state explained to the trial court that they were not relying on Helms's testimony for the purpose of identification. Thus, the trial court granted the state's motion.

{¶ 18} On October 25, 2021, Staken filed a written waiver of his right to a jury trial and requested a bench trial. The trial was held on the same day. At trial, Ysabella testified that on the evening of the incident at the Helms's home, she and Staken were getting high at Staken's home. At some point during the evening, Reese joined them, and they were being driven around a neighborhood, and when they

exited the vehicle, Reese and Ysabella left their phones in the car. Staken walked away by himself, while Reese and Ysabella walked together. Staken called Ysabella's name, and the two women found him in a driveway holding Helms by the arm. Staken asked Ysabella to search Helms's pockets, and Ysabella told Helms to do everything Staken requested so Helms would not get hurt. Ysabella testified that Helms was crying and asking them to stop. Ysabella testified that she did not have a gun. She also testified that the credit card she used was from Helms's purse, which Staken gave to her. Ysabella stated that she and Staken used the card to make purchases at Walgreens and the train station.

{¶ 19} At the end of the trial, the trial court found Staken guilty and sentenced him to ten years in prison. Staken filed an appeal and assigned two errors for our review:

> I.  The trial court violated appellant's right to confrontation of witnesses under the Sixth and Fourteenth amendments of the United States Constitution and Article One, Section Ten of the Ohio Constitution when it permitted the victim and another critical witness to testify via zoom and not in person; and
>
> II. Appellant's conviction is against the manifest weight of the evidence.

## I.  Right to Confrontation

### A.  Standard of Review

{¶ 20} "'We apply a de novo standard of review to evidentiary questions raised under the Confrontation Clause.'" *State v. Jones*, 8th Dist. Cuyahoga

No. 110742, 2022-Ohio-1936, ¶ 24, quoting *State v. Bowleg*, 8th Dist. Cuyahoga Nos. 100263 and 100264, 2014-Ohio-1433, ¶ 10.

## B. Law and Analysis

{¶ 21} In Staken's first assignment of error, he argues that the trial court violated his constitutional rights when it allowed Helms and her husband to testify via videoconferencing. Staken contends because Helms and her husband did not testify in person, he was not able to witness and observe their mannerisms or facial expressions. He also argues that the court could not ensure that the witnesses were not being impacted by others in the room who could potentially feed answers to them. "The Sixth Amendment to the United States Constitution provides in relevant part that '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him [or her].'" *Id.*

{¶ 22} Staken argues that the Confrontation Clause requires that witnesses testify in person. However, the Supreme Court, in *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Court stated "the word 'confronted,' as used in the Confrontation Clause, cannot simply mean face-to-face confrontation."

> As the United States Supreme Court held, while the Confrontation Clause reflects a preference for face-to-face confrontation at trial, the defendant's right to confrontation is not violated provided that the witness "testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies."

*In re H.P.P.*, 8th Dist. Cuyahoga Nos. 108860 and 108861, 2020-Ohio-3974, ¶ 26.

{¶ 23} Additionally, as the trial court reasoned during the hearing on the state's motion, the Helmses were not testifying against Staken. Helms was unable to identify her attacker, and her husband did not witness the attack. Their testimony was not used for the purpose of identifying Staken, but merely to provide context for the purposes of the investigation. *See State v. Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 41 ("Ohio and federal courts have permitted the introduction of testimonial statements not subjected to prior confrontation where the testimony merely provided background information or a context for the investigation.").

{¶ 24} Staken's trial counsel explained to the trial court that Staken's defense was that he was not the one that attacked Helms. The fact that there was an incident at Helms's home that resulted in her being injured and robbed was not at issue, nor was it Staken's defense that her husband did not call 911. In fact, at the motion hearing, trial counsel stated that they would stipulate to the fact that the 911 call was made. As the record reflects, Ysabella identified Staken as the perpetrator of the assault and robbery and testified in person. Staken then had the opportunity to confront the witness of the critical issue of identity.

{¶ 25} Therefore, Staken's first assignment of error is overruled.

## II. Manifest Weight of the Evidence

### A. Standard of Review

{¶ 26} "The criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Ryan*, 8th Dist. Cuyahoga No. 108143, 2019-Ohio-5339, ¶ 21, citing *State v. Wilson*, 113 Ohio St. 3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Under the manifest-weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's?" *Id.* "Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence." *Id.*, citing *Thompkins* at 387.

{¶ 27} "'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony.'" *Wilson* at *id.*, quoting *Thompkins* at *id.*

{¶ 28} In evaluating a challenge to the verdict based on the manifest weight of the evidence in a bench trial

> the trial court assumes the fact-finding function of the jury. Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a

manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*Ryan* at ¶ 23, quoting *Cleveland v. Welms*, 169 Ohio App. 3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 16 (8th Dist.). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id., citing* Thompkins at *id.*

## B. Law and Analysis

{¶ 29} In Staken's second assignment of error, he argues that his conviction was against the manifest weight of the evidence. Specifically, he contends that because Helms identified another man as the primary assailant, and the police never interviewed the other man in connection with the incident, this court should vacate his conviction.

{¶ 30} Upon review, this is not an exceptional case in which the evidence weighs heavily against the conviction. Ysabella testified that she was with Reece and Staken on the night of the incident. Reece also stated to Officer Guerra, on the night of the incident, that she was with "Cash," who was later identified as Staken. Staken, during his police interview, stated that he was with Ysabella during the incident, and that she was the one who robbed and assaulted Helms. However, in his appeal, Staken claims that he could have been just guilty of using the credit cards.

{¶ 31} Staken contends that the trial court should not have accepted Ysabella's testimony. "However, we are constrained to adhere to the principle that

the credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve." *Parma v. Singh*, 8th Dist. Cuyahoga No. 106935, 2018-Ohio-5235, ¶ 21. "We are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections — observations that are critical to determining a witness's credibility." *Id.*, citing *State v. Clark*, 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, ¶ 17. "The trier of fact is free to accept or reject any or all the testimony of any witness." *Id.*, citing *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16.

{¶ 32} In this instant case, the trial court was in the best position to determine Ysabella's credibility. Ysabella testified that Staken instructed her to go through Helms's pockets, and she asked Helms to do what Staken told her. Ysabella stated that once she searched Helms's pockets, she ran away. Ysabella also testified that Staken had a gun. During her testimony, the state showed Ysabella a picture that was posted on social media of Ysabella holding a gun. Ysabella testified that the gun in the picture was the gun that Staken used the night of the incident.

{¶ 33} Having reviewed the entire record, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice. Therefore, Staken's second assignment of error is overruled.

{¶ 34} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
SEAN C. GALLAGHER, A.J., CONCURS IN JUDGMENT ONLY (WITH SEPARATE OPINION)
SEAN C. GALLAGHER, A.J., CONCURRING IN JUDGMENT ONLY:

{¶ 35} I respectfully concur in judgment only. Staken's argument pertains to the use of live-video testimony. In *Maryland v. Craig*, the Supreme Court concluded that the Confrontation Clause use of the word "confronted" cannot "simply mean face-to-face confrontation." 497 U.S. 836, 849, 110 S.Ct. 3157 (1990). Instead, and although the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," that interest "must occasionally give way to considerations of public policy and the necessities of the case." *Id.*, quoting *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Thus, a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation

is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850; *State v. Frierson*, 2019-Ohio-317, 129 N.E.3d 1004, ¶ 17 (8th Dist.).

{¶ 36} Notwithstanding, there is no need to address the propriety of the trial court's decision. Staken has not demonstrated that procedural use of the live-video testimony, even presuming error exists for the sake of the discussion, is anything but harmless error in this particular case. *See, e.g., State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573, ¶ 21 (8th Dist.) (the error in permitting the out-of-state witness to testify was harmless).

{¶ 37} And finally, I disagree with the majority providing deference to the trier-of-fact's credibility determinations under the weight-of-the-evidence standard of review. Although the majority relies on *Parma v. Singh*, 8th Dist. Cuyahoga No. 106935, 2018-Ohio-5235, ¶ 21, in support of its deference to the trier-of-fact, *Singh* cited *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967), as the basis for the panel's conclusion. *DeHass* is based on the sufficiency-of-the-evidence review and is not applicable to the *Thompkins* standard for reviewing the weight of the evidence. *See, e.g., State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 2; *State v. Metz*, 2019-Ohio-4054, 146 N.E.3d 1190, ¶ 125 (8th Dist.) (S. Gallagher, J., concurring in part and dissenting in part) (providing a more thorough discussion of the issue).

{¶ 38} It is well settled that when reviewing the sufficiency of the evidence, appellate courts defer to the credibility determinations of the trier-of-fact. A claim that a verdict is against the weight of the evidence, however, involves a separate and distinct test *that is much broader* than the test for sufficiency. *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193. In contrast to sufficiency of the evidence, "[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence'[.]" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). Under this review, the appellate panels sit as the "thirteenth juror," with the ability to disagree with the trier-of-fact's conclusion. *Id.* We cannot simultaneously defer to the trier-of-fact's credibility determinations while undertaking our own review of the overall credibility of the state's case under the *Thompkins* standard.

{¶ 39} Thus, in deferring to the trier-of-fact, the majority is not reviewing the assigned error as presented, which challenges the weight of the evidence in support of the conviction. As a result, I cannot join the majority's analysis. Nevertheless, this is not the exceptional case warranting appellate intervention, so I concur with the majority's ultimate outcome.

{¶ 40} For the foregoing reasons, I concur in judgment only.