[Cite as *State v. Kennedy*, 2024-Ohio-1586.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 112879 |
| ANTONIO KENNEDY, | : | |
| Defendant-Appellant. | : | |

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 25, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-667979-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Marco Tanudra and John Hirschauer, Assistant Prosecuting Attorneys, *for appellee.*

Edward M. Heindel, *for appellant.*

ANITA LASTER MAYS, J.:

**{¶ 1}** Defendant-appellant Antonio Kennedy ("Kennedy") appeals his bench trial convictions for multiple counts. We affirm the trial court's judgment.

## I. Background and Facts

{¶ 2}  Kennedy's convictions arose from the shooting of victim Henry Carter ("Carter") on the night of June 16, 2021.  Kennedy maintains he was not the assailant and suggested checking with an individual who resided on the West Side of Cleveland known as "Q."

{¶ 3}  Carter's wife, Tawana Hill ("Hill"), testified that Carter performed odd jobs and sold drugs including to Kennedy who was known as "Tone."  Hill had never seen Kennedy's face and could not describe him but knew that Carter sometimes rented a tan colored four-door Honda Accord from Kennedy in exchange for drugs and that Kennedy worked at Popeyes Chicken on Lee Road.

{¶ 4}  About 10:30 p.m., Carter told Hill he was leaving to respond to two calls for drugs; Kennedy was waiting outside to pick him up and he left with bags of marijuana, cocaine, and ecstasy, along with his phone and money but did not take his guns. Hill saw him enter the Honda Accord.  Hill began calling Carter about 11:30 p.m. or midnight but could not reach him.  She began checking hospitals and jails and eventually located him at the morgue.

{¶ 5}  During cross-examination, Hill recalled telling detectives from the Cleveland Police Department ("CPD") that Carter was going to purchase a turquoise Honda from Kennedy which refreshed her recollection that the Honda was not tan but said the car had a loud muffler. Hill admitting telling police that Carter had a drug customer on the West Side of Cleveland but denied informing them that the customer's name was "Q" and said the only "Q" she knew was her husband's best

friend, Quadell Jackson. Tr. 138. Hill denied telling police that Carter argued with the West Side customer, but said Carter argued with Kennedy about short-changing Kennedy in the amount of drugs he gave Kennedy in exchange for renting Kennedy's car. Hill did not see who was driving the Honda when Carter was picked up, but Carter told her it was Kennedy, and she heard the loud muffler.

{¶ 6} India Jackson ("Jackson") began working as a manager at Popeyes' Lee Road location in June 2021. Jackson's manager provided police with a security video and a roster of the employees. Police returned about a week later to have Jackson identify a photograph of an employee listed as "Antonio Campbell." Jackson identified him as a cook that she only knew as "Tone." Tr. 152. She also identified a photograph of the cashier, Jaeshawna Campbell ("Campbell"). Jackson had no direct knowledge of the relationship between Kennedy and Campbell but had heard rumors.

{¶ 7} Popeyes' cashier Jaeshawna Campbell ("Campbell") said she met Kennedy in 2020 at her sister's home and moved in with Kennedy at the home of Kennedy's brother Quentin Kennedy ("Quentin") in late 2020 or early 2021. Campbell met with Det. Jonathan Dayton ("Det. Dayton") in January 2023 and identified a photograph of Carter. She met Carter when she and Kennedy went to purchase marijuana one night. Carter entered the back seat of Kennedy's black SUV to conduct the transaction.

{¶ 8} Campbell and Kennedy later argued about whether Carter flirted with her as he exited the car. Kennedy stormed out of the house and did not return for

two days. When Kennedy returned, he acted anxious, paranoid, and upset. Campbell attributed Kennedy's behavior to "stuff he was going through." Tr. 427. Campbell also said Kennedy was not acting differently when he came back and "because I went through other stuff with him, so it's like the behavior and stuff wasn't really new to me." Tr. 430. Campbell admitted that she and Kennedy were fired from Popeyes for arguments on the job. Campbell could not provide dates for the recited events but recalled that it was 2021 and warm outside.

{¶ 9} Quentin, a self-employed music studio engineer with a home-based studio, testified that he and his brother Kennedy had a good relationship. Quentin owned a blue Hyundai Sonata that he let Kennedy drive to work. On February 17, 2022, the CPD SWAT team executed a warrant at Quentin's home and Kennedy was removed and handcuffed.

{¶ 10} Quentin was also taken to the station and his recorded interview with CPD Det. Dayton was played to refresh his recollection about "any incident that had happened in the past" that was shared with him by Kennedy. Tr. 173. Quentin recalled that in July 2021, Kennedy told him that he was in the Kinsman area "to buy something" when another car with an armed individual pulled up and tried to rob him. There was a shooting, and Kennedy got rid of the gun but did not say where.

{¶ 11} Carter's good friend of 14 years, Quadell Jackson ("Jackson"), referred to as "Q" by Hill, met Kennedy about two months prior to Carter's death.

Jackson got "nothing but bad vibes" from Kennedy. Tr. 268. Jackson knew that Kennedy bought drugs from Carter.

{¶ 12} Two days before the incident, Jackson took Carter to Popeyes to pick up a car from Kennedy. Jackson said:

> [Carter] handed [Kennedy] a package in exchange for the car so he can get the car for the day. [Kennedy] did not like the package or — I guess it was short [on the amount of drugs that Carter had agreed to pay Kennedy to use the car.] [Carter] got a bad habit of — he would short somebody in a heartbeat like. So I guess [Kennedy] said, "You're not going to keep doing this to me like this," with a finger pointed at him. I took it seriously, [Carter] didn't.

Tr. 273. Carter retrieved the car keys, and the parties went their own ways. Jackson did not recall the color or model of the car but remembered it was small.

{¶ 13} Jackson was at home with his girlfriend, Carolyn Lewis ("Carolyn"), the night of the shooting. Carter called Jackson for a ride that day saying he needed to get somewhere in a hurry, but Jackson did not take him.

{¶ 14} Police showed Jackson a photograph of Quavon Brown ("Quavon") who was also known as "Q." Jackson said he did not know him personally but had previously driven Carter to the West Side to "meet up" with Quavon. He was not aware of any disagreements between Quavon and Carter.

{¶ 15} Jackson's girlfriend Carolyn met Kennedy on June 15, 2021. Tr. 307. Carolyn heard Jackson ask Carter how long he had known Kennedy who responded, "for some time." Tr. 317. Jackson was concerned because he and Carter were good friends, yet he had never met Kennedy before. Carolyn and Jackson's brother Chris agreed that they got a "bad vibe" from Kennedy. Tr. 321.

{¶ 16} Tasonna Lewis ("Tasonna") testified she met Kennedy in 2020 and they had the same group of friends. Tasonna was arrested attempting to use a store credit card allegedly purchased from Kennedy that she said she did not know was stolen. Tasonna contacted Kennedy but did not see Kennedy until he stopped by her job in June or July 2021. He behaved as though "something was wrong" and told her he would return her money but needed her to be patient because "he killed somebody" at "93rd and Holton." Tr. 387. "He was meeting them to get marijuana. He said he called him to get weed, but the dude tried to rob him, and it was like it was him or him." Tr. 388. Kennedy told her "[he] went back to his dad's house. He got rid of the gun. He said he was laying low." Tr. 388.

{¶ 17} Tasonna said she did not know Carter's family and denied she was testifying to get back at Kennedy. Though she was angry about the credit card, "[i]t was more so the daughter of the victim. Like, they came in my job and she was crying." Tr. 389. "And I didn't know like it was [Kennedy] they were talking about until he gave me the details and I was like damn." Tr. 389. "I don't know the victim's kids or his kids' mother. I don't know him. I know a mutual friend of hers." Tr. 389.

{¶ 18} Tasonna testified she initially thought police contacted her regarding her brother's murder that took place in June 2021 in the Garden Valley neighborhood where her family resided. During cross-examination, Tasonna had difficulty remembering the dates, the conversations, and contacts with Kennedy that occurred.

{¶ 19} CPD Officer Brian Soucek ("Ofc. Soucek") and his partner were the first to arrive at the scene in response to a dispatch call for a male down at 1:49 a.m. and called for EMS. The area had a few houses and a motorcycle club that was located under two bridges, secluded, and dimly lit.

{¶ 20} CPD homicide Detective Thelemon Powell ("Det. Powell") responded to the scene at about 2:30 a.m., where fellow homicide Detective Dayton was also present. Det. Powell observed a deceased male with a gunshot wound in the right temple area above the ear. The detective narrated the scene photographs. A 9 mm spent bullet casing was located near the body. A photograph of Carter's hand appeared to have a partially rolled marijuana cigarette. Apparent blood was present on Carter's right side. One dollar and lottery tickets were the only items found on the body. No other items were recovered at the scene. Attempts to obtain security videos of the incident were unsuccessful.

{¶ 21} On June 20, 2021, the detective was informed by Hill that Carter offered Kennedy, whom she referred to as "Tone," some marijuana to take him to the West Side of Cleveland to sell drugs and that Kennedy picked Carter up. The detective checked the employment roster at Popeyes, saw the name "Anthony Campbell" and determined it could be "Tone." He interviewed "Tone" who was very cooperative but remained a suspect. The detective subsequently discovered Kennedy's name and participated in the search warrant execution where Kennedy was arrested. Det. Powell testified that no 9 mm weapons were seized during the search warrant execution, though a Glock 9 mm magazine was recovered. Tr. 242.

**{¶ 22}** The detective recalled going to a west side location to interview Quavon Brown based on a conversation with Kennedy's sister, Kizzie Day.

> Counsel:  Okay. Do you recall ever interviewing Quavon Brown?
>
> Powell:  I believe we did, yes.
>
> Counsel:  Okay.  Did you — do you recall when he was interviewed?
>
> Powell:   I recall being like through the outside of an apartment complex. I don't believe I initiated the interview but —
>
> Counsel: Fair enough. I understand.
>
> Powell:  I do recall interviewing Quavon Brown.

Tr. 231.

**{¶ 23}**  Forensic DNA Analyst Salesha Frantz ("Frantz") of the Cuyahoga County Regional Forensic Science Laboratory tested the evidence and recorded the results. Kennedy's DNA record was stored in the Combined DNA Index System database ("CODIS") maintained by the Bureau of Criminal Investigation ("BCI").

**{¶ 24}** Frantz did not test the shell casing because there "was only one swab from the shell casing" and she "would need to consume the entire swab and we did not receive permission to consume that swab." Tr. 345.  Thus, there was no DNA evidence tying the 9 mm shell casing found at the site to Kennedy.  Swabs from the inside and outer edge of the left front and right back pockets of Carter's sweatpants contained DNA from Carter, two unknown contributors, and Kennedy. Swabs of Carter's fingernails, knuckles, and palm contained DNA from an unknown contributor.

{¶ 25} Frantz was not aware of any lab testing that could determine the approximate age or condition of an item or how many times an item had been worn. She agreed that multiple interactions between Kennedy and Carter increased the likelihood that Kennedy's DNA would be present — even from a hand touching a hand. "It's possible." Tr. 358.

{¶ 26} Crime Analyst Reem Almukdad ("Almukdad") with the Cuyahoga County Prosecutor's Office Crime Strategies Unit utilized CellHawk software to map cell phone location information obtained from cellular providers. Carter's phone data did not confirm Kennedy's statement to police that he dropped Carter off near East 116th Street and Miles Avenue that night but did confirm Carter was at the East 90th and Holton location. Almukdad did not know whether the parties had other cell phones.

{¶ 27} Forensic Pathologist Dr. Todd Barr with the Cuyahoga County Medical Examiner's Office arrived at the scene around 3:00 a.m. and estimated death had occurred one or two hours earlier. The parties stipulated that the cause of death was "a gunshot wound with transection of the cervical spinal cord, and it is a homicide." Tr. 482. During the autopsy, the doctor discovered blunt force injuries including "abrasions of the forehead, the right forearm, the right knee, the right lower leg, the left side of the nose, and an abraded laceration on the bridge of his nose." Tr. 486. The weapon was fired more than three feet from the victim. The bullet entered the right side of the face and exited the left side of the neck though the doctor could not identify the positions of the parties at the time of the shooting.

{¶ 28} Homicide Unit Det. Dayton worked on the case with Det. Powell. The detective met with Tasonna regarding the stolen credit card and Kennedy's statement that he shot and killed someone on Holton Avenue. Tasonna provided him with an address that allowed him to find Kennedy's name in the Ohio Law Enforcement Gateway ("OHLEG") that includes driver's license and car registration information.

{¶ 29} Carter's wife Hill and sister Kizzy Day contacted Det. Dayton to tell him that they retrieved security video from the Omens Motorcycle Club near the scene. The video was played for the trial court.

> Det. Dayton: The footage depicts a vehicle traveling westbound on Holton. It comes to a stop at the intersection of Holton and East 90th and you can see on the driver's side of the vehicle a muzzle flash and then the vehicle pulls away and it travels — it makes a left-hand northbound turn from Holton Avenue onto East 90th and goes out of view.
>
> The roadway that you see directly in front of the camera is Holton Avenue. Where you can see the headlights off this the upper right-hand corner, that's the intersection of Holton Avenue and East 90th. So we're looking westbound down Holton Avenue towards Holton Avenue and East 90th.

Tr. 533-534. The detective described two muzzle flashes. A suspect vehicle was not recovered. The detective did not believe the video timestamp was correct. The 911 call was received at approximately 1:40 a.m.[1]

---

[1] This court's review of the 1:05 minute video reveals that the area was dark with a few streetlights in the area of the security camera. Bright headlights emanated from a vehicle that stopped about a block down the street from the camera location. A flash of light, followed approximately ten seconds later by a second flash, that could possibly have been gunfire occurred. Neither the vehicle nor any other activity could be observed due to the bright headlights.

{¶ 30} Kennedy was interviewed by Det. Dayton and Det. Powell after his arrest. The video was played for the trial court. Kennedy admitted during the police interview that he purchased drugs from Carter with cash the night of the incident. Kennedy said he had dropped Carter off at East 116th Street and Miles, and Kennedy maintained his innocence. At one point Kennedy said that Jaeshawna was with him when he dropped Carter off, but they were no longer together, and he did not know her phone number or where she lived.

{¶ 31} During Det. Dayton's interview with Hill at Carter's sister's house, the name and phone number of Quavon Brown was provided, and the name of Brown's girlfriend Terra Billups, also known as Sonata, was also mentioned. The detective could not recall whether he talked with the girlfriend and said he could not locate Quavon who was on parole, and the parole department could not find him either.

{¶ 32} Det. Dayton believed that Carter was riding in the car as a passenger when he was shot, though the medical examiner testified that the bullet entered Carter's right temple and exited on the posterolateral left neck, traveling "right to left, slightly front to back and downward." Tr. 486. Carter's pants pockets were turned outward. Carter's cell phone records did not indicate he traveled to the West Side that night.

{¶ 33} The state rested, Kennedy's Crim.R. 29 motion for judgment of acquittal was denied, the defense rested, and the renewed Crim.R. 29 motion was denied.

**{¶ 34}** Kennedy was found not guilty of two counts of aggravated murder under R.C. 2903.01(A) and (B) and was convicted of:

> Murder R.C. 2903.02(A), an unclassified felony, with firearm specification(s), — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 3 of the indictment.

> Murder R.C. 2903.02(B), an unclassified felony, with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 4, 5 of the indictment.

> Felonious assault R.C. 2903.11(A)(1), a second-degree felony, with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 6 of the indictment.

> Felonious assault R.C. 2903.11(A)(2), a second-degree felony, with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 7 of the indictment.

> Aggravated robbery R.C. 2911.01(A)(1), a first-degree felony, with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 8 of the indictment.

> Aggravated robbery R.C. 2911.01(A)(3), a first-degree felony, with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 9 of the indictment.

> Discharge of firearm on or near prohibited premises R.C. 2923.162(A)(3), a first-degree felony, with firearm specification(s) — 1 year (2941.141), firearm specification(s) — 3 years (2941.145) as charged in count(s) 10 of the indictment.

> Having weapons while under disability R.C. 2923.13(A)(2), a third-degree felony, as charged in count(s) 11 of the indictment.

Journal Entry No. 148188666, p. 1-2 (May 5, 2023).

**{¶ 35}** Kennedy was sentenced to an aggregate term of 21 years to life:

> For sentencing purposes all 1-year firearm specifications (in count(s) 3, 4, 5, 6, 7, 8, 9, 10) merge into the 3-year firearm spec in count 3.

> Counts 3, 4, and 5 merge for sentencing purposes into count 3.

Counts 6 and 7 merge for sentencing purposes into count 6.

Counts 8 and 9 merge for sentencing purposes into count 8.

Count 3 — 15-years-to-life +3-year firearm spec. (18 yrs. on this count)

Count 4 — base charge merges into count 3 + 3-year firearm specification to run consecutive to 3-year firearm specification in count 3.

Count 5 — no sentence imposed- merges into count 3.

Count 6 — 8 years minimum-12 years maximum on base charge +3-year firearm spec.*to run concurrent to all other firearm specifications*

Count 7 — base charge merges into count 6 + 3-year firearm specification to run *concurrent to all other firearm specifications.

Count 8 — 10 years minimum-15 years maximum on base charge + 3-year firearm spec.*to run concurrent to all other firearm specifications*

Count 9 — base charge merges into count 8 +3-year firearm spec.*to run concurrent to all other firearm specifications*

Count 10 — 10 years min-15 years max +3-year firearm spec.*to run concurrent to all other firearm specifications*

Count 11 — 3 years.

Counts to run concurrent for a total time of 21 years to life.

Journal Entry No. 148188666, p. 2 (May 30, 2023).

**{¶ 36}** Kennedy appeals.

## II.  Assignments of Error

**{¶ 37}** Kennedy raises the following assignments of error:

I.      The trial court erred when it admitted other acts evidence without following the procedure set forth in Evidence Rule 404(B).

II.     Kennedy was denied his right to the effective assistance of counsel because counsel did not raise the issue of DNA secondary transfer and did not object to the introduction of other acts evidence.

III. The convictions were not supported by sufficient evidence.

IV. The convictions were against the manifest weight of the evidence.

## III. Analysis

### A. Other Acts Evidence

**{¶ 38}** Kennedy contends the trial court failed to follow the procedure set forth in Evid.R. 404(B) when it admitted other-acts evidence. This court does not find that to be the case.

#### 1. Standard of Review

**{¶ 39}** To the extent that this argument is raised for the first time on appeal, it will be reviewed for plain error.

> "[A] reviewing court's analysis is generally limited to reviewing issues raised on appeal solely for plain error or defects affecting a defendant's substantial rights pursuant to Crim.R. 52(B). *State v. Tisdale*, 8th Dist. Cuyahoga No. 74331, 1998 Ohio App. LEXIS 6143 (Dec. 17, 1988). The plain error doctrine should be invoked by an appellate court only in exceptional circumstances to prevent a miscarriage of justice. *State v. Cooperrider*, 4 Ohio St.3d 226, 227, 448 N.E.2d 452 (1983). Plain error will be recognized only where, but for the error, the outcome of the case would clearly have been different. *Id.*"

*State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶ 61, quoting *State v. King*, 184 Ohio App.3d 226, 2009-Ohio-4551, 920 N.E.2d 399, ¶ 8 (8th Dist.).

**{¶ 40}** "The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law" that we review de novo. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. However, "the trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice to the defendant under Evid.R. 403(A) involves an exercise of judgment." *State v. Kamer*,

6th Dist. Wood No. WD-20-084, 2022-Ohio-2070, ¶ 132, citing *State v. Worley*, 164

Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 117, citing *Hartman* at ¶ 30.

"[S]o we review that decision for an abuse of discretion." *Id.*, citing *id.* An abuse of

discretion occurs where "'the trial court's attitude, in reaching its decision, was

arbitrary, unreasonable, or unconscionable.'" *Johnson v. Abdullah*, 166 Ohio St.3d

427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 34, quoting *Celmer v. Rodgers*, 114 Ohio

St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19 (plurality opinion).

## 2. Discussion

**{¶ 41}** Evid.R. 404(B) provides:

(B) Other crimes, wrongs, or acts.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶ 42}** Evid.R. 403(A) adds that "[a]lthough relevant, evidence is not

admissible if its probative value is substantially outweighed by the danger of unfair

prejudice, of confusion of the issues, or of misleading the jury." The exclusion of

relevant evidence under Evid.R. 403(A) rests within the discretion of the trial court.

*State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 107, citing

*State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the

syllabus.

**{¶ 43}** In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 19, the court set forth a three-step analysis to determine whether other-acts evidence is admissible. First the trial court had to "consider whether the other-acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401." *Id.* at ¶ 20. Second, the trial court had to "consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Third, the trial court had to "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R 403." *Id.*

**{¶ 44}** Kennedy first argues that the state failed to provide notice per Evid.R. 404(B) that requires the "proponent of evidence" to "provide reasonable notice" prior to "or during trial if the court excuses pretrial notice" for "good cause shown of the general nature of any such evidence it intends to introduce at trial." *Id.* "Nevertheless, as indicated in the Staff Notes to the rule, the notice requirement 'should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice, absent a showing of bad faith.'" *Brecksville v. Sadaghiani*, 8th Dist. Cuyahoga No. 109992, 2021-Ohio-2443, ¶ 76, citing *State v. Plevyak*, 11th Dist. Trumbull No. 2013-T-0051, 2014-Ohio-2889, ¶ 21.

{¶ 45} Kennedy identifies as improper the testimony of Tasonna Lewis that Kennedy engaged in credit card fraud, confessed to killing someone, and repetitive testimony that Kennedy engaged in drug transactions. The state counters that Kennedy received a police report containing a summary of Tasonna Lewis's interview and a video recording, and reports regarding Quadell Jackson and Carter's wife Tawana Hill. The defense conceded on the record that the information had been received. Thus, Kennedy could not have been surprised at the testimony.

{¶ 46} The state's failure to give prior notice of its potential use of Evid.R. 404(B) evidence is "'not reversible error where the witness's name and testimony to which the defendant'" now objects "'were disclosed to the defendant in the police report'" and the video interview "'that was provided to the defendant prior to trial.'" *Id.* at ¶ 77, quoting *Cleveland v. Lowery*, 8th Dist. Cuyahoga No. 103722, 2016-Ohio-5626, ¶ 30.

{¶ 47} Kennedy also contends testimony by Tasonna Lewis and Quadell Jackson was used to establish Kennedy's bad character. Specifically, Tasonna Lewis's testimony that she was arrested and jailed for using the credit card she allegedly purchased from Kennedy for $1,500. Quadell Jackson testified that Kennedy purchased drugs from Carter and did not look happy with the package. Kennedy claims that these statements showed his bad character "as a drug-addicted thief who would steal money from his own friends and allow his friend to get arrested." Appellant's brief, p. 22.

{¶ 48} The state argues Jackson's testimony regarding the drug relationship and interaction between Kennedy and Carter supported the elements of the aggravated murder count and is not prohibited by Evid.R. 404(B). The state is correct that evidence of proof of motive is permitted under Evid.R. 404(B)(2). Hill's testimony confirmed tension between Kennedy and Carter regarding the amount of drugs provided in exchange for use of Kennedy's car. Any error on this point is harmless because the trial court did not convict Kennedy of the aggravated murder count.

{¶ 49} As for Tasonna Lewis's testimony regarding the credit card transaction, the state argues that the testimony was not offered as a prior bad act or considered as one by the trial court. The testimony explained the "nature of the relationship" between the parties, "their subsequent fallout" and explained why Kennedy "would appear out of the blue to confess to her that he killed someone at 93rd and Holton." Appellee's brief, p. 10-11.

{¶ 50} The state provided discovery of the statements by Tasonna Lewis, Quadell Jackson, and Tawana Hill. We keep in mind that this was a bench trial. In a bench trial under Ohio law, "the trial court is entitled to the presumption of regularity, that is, the trial court is presumed to know and follow the law in arriving at its judgment unless it affirmatively appears to the contrary." *State v. Shropshire*, 8th Dist. Cuyahoga No. 103808, 2016-Ohio-7224, ¶ 37, citing *State v. Eley*, 77 Ohio St.3d 174, 180, 672 N.E.2d 640 (1996), citing *State v. Post*, 32 Ohio St.3d 380, 513 N.E.2d 754 (1987). "[I]n an appeal from a bench trial, we presume that a trial court

relies only on relevant, material, and competent evidence in arriving at its judgment." *Id.*, citing *id*.

**{¶ 51}** The first assignment of error is overruled.

**B. Effective assistance of counsel**

**{¶ 52}** Kennedy argues his right to effective assistance of counsel was denied by counsel's failure to raise the issue of DNA secondary transfer and to object to the introduction of other acts evidence.

**1. Standard of review**

**{¶ 53}** A claim of ineffective assistance of counsel is judged using the standard announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *State v. Sims*, 8th Dist. Cuyahoga No. 109335, 2021-Ohio-4009, ¶ 21, citing *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). "'Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.'" *Id.*, quoting *Bradley*, at paragraph two of the syllabus. To establish prejudice, Kennedy must demonstrate there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### 2. Discussion

**{¶ 54}** This court has overruled the first assigned error regarding the introduction of other-acts evidence. Thus, this court does not find counsel was ineffective on this issue.

**{¶ 55}** Kennedy argues that trial counsel failed to address the issue of secondary DNA transfers. "Secondary transfer of DNA is the transfer of DNA through an intermediary." *State v. Williams*, 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 59, fn. 2. Also, "'[s]econdary transfer' occurs when a person touches something that a second person has previously touched and then deposits that second person's DNA onto another surface." *State v. Price*, 8th Dist. Cuyahoga No. 111921, 2023-Ohio-3790, ¶ 24. *See also State v. James*, 7th Dist. Mahoning No. 18 MA 0064, 2020-Ohio-4289, ¶ 89 (a secondary transfer of DNA occurs "when person A touches person B, person B then touches an object, and person A's DNA is on the object.").

**{¶ 56}** Forensic analysis Franz determined that samples from Carter's left front and back right pocket contained DNA from Carter, two unknown contributors, and Kennedy. Kennedy's DNA was not found on any other evidence.

**{¶ 57}** Franz testified that DNA could be transferred through sweat, touch, bleeding, and spitting and could "basically come off of your body any certain way." Tr. 327. Under further inquiry by defense counsel, Franz agreed that DNA testing could not reveal whether the pants had been worn multiple times. Frantz did not deny that as an item is worn more than once, additional, or repeated DNA material

could be transferred to that item. In fact, Franz confirmed that skin samples that could contain measurable DNA material sloughs off skin daily and multiple interactions between Kennedy and Carter would make it more likely that Kennedy's DNA could be on Carter's person. Testimony from multiple witnesses, as conceded by Kennedy during his statement to police, revealed that Carter was a drug dealer and Kennedy purchased drugs from Carter.

**{¶ 58}** This court reiterates that this was "a bench trial where the trial judge is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision." *State v. Primous*, 2020-Ohio-912, 152 N.E.3d 1002, ¶ 60 (8th Dist.), citing *State v. Bays*, 87 Ohio St.3d 15, 27, 716 N.E.2d 1126 (1999).

**{¶ 59}** We do not find that counsel was ineffective.

**{¶ 60}** The second assignment of error is overruled.

### C. Sufficiency and manifest weight of the evidence

**{¶ 61}** The third and fourth errors challenge the sufficiency and manifest weight of the evidence. We combine the errors for efficiency.

### 1. Standard of Review

**{¶ 62}** "Because a Crim.R. 29 motion for acquittal questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

**{¶ 63}** "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id*. at ¶ 38, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a test of adequacy." *Id*. "We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *Id*., citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 64}** While sufficiency tests the adequacy of the evidence to support the verdict as a matter of law, a manifest weight inquiry asks whose evidence is more persuasive at inducing belief, "the state's or the defendant's?" *State v. Ryan*, 8th Dist. Cuyahoga No. 108143, 2019-Ohio-5339, ¶ 21, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence." *Id*., citing *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000).

**{¶ 65}** We also recognize that the trial court and not a jury is serving as the factfinder in our manifest-weight review of a bench trial verdict.

> "Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered."

*State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 25 (8th Dist.), quoting *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125 (8th Dist.), citing *Thompkins* at 390. *See also State v. Kessler*, 8th Dist. Cuyahoga No. 93340, 2010-Ohio-2094, ¶ 13. Only in the most "'exceptional cases in which the evidence weighs heavily against the conviction, should a conviction be reversed as against the manifest weight of the evidence.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 2. Discussion

**{¶ 66}** "When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless." *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990). *See also State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23, quoting *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12 ("For the purposes of R.C. 2941.25, a 'conviction' consists of a guilty verdict and the imposition of a sentence or penalty.") (Emphasis sic.) A defendant cannot challenge a conviction that was merged because "[t]he counts that merged with the aggravated murder conviction are not convictions, and therefore, we cannot individually review the evidence supporting those findings of guilt." *Worley* at ¶ 23.

**{¶ 67}** Therefore, this court reviews the sufficiency of the evidence supporting the convictions for murder, felonious assault, aggravated robbery, discharge of a firearm over prohibited premises, and having a weapon under disability.

**{¶ 68}** Kennedy contends that police arrested the wrong person though the defense proposed other drug purchaser candidates as possible culprits. Kennedy also reiterates his concern that the trial court did not hear that DNA was easily transferable, an argument rejected by this court under the second assignment of error.

**{¶ 69}** There was testimony that Kennedy picked Carter up the night of the incident and that Kennedy was displeased that Carter shorted him on the amount of drugs that Carter was providing in exchange for the use of Kennedy's vehicle. Kennedy told police that he dropped Carter off at East 116th and Miles Avenue the night of the incident, though the evidence demonstrated that Carter's cell phone was at East 90th and Holton Avenue. Tasonna Lewis testified that Kennedy told her that he killed someone on Holton Avenue. Kennedy's brother Quentin told police that in July 2021, Kennedy said he was in the Kinsman area "to buy something" and another car with an armed individual pulled up and tried to rob him. Kennedy told him there was a shooting, and he got rid of the gun but did not say where. Quentin denied making the statement when detectives left Kennedy and Quentin alone in the interrogation room but did not speak when the detectives re-entered the room and asked Quentin whether he made the statement.

{¶ 70} "When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence." *State v. Garcia*, 8th Dist. Cuyahoga No. 107027, 2022-Ohio-3426, ¶ 32, quoting *State v. Palmer*, 7th Dist. Mahoning No. 19 MA 0108, 2021-Ohio-4639, ¶ 45, citing *Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, at 272-273.

{¶ 71} This court finds that, if believed, the evidence and testimony submitted to the trial court would convince the average mind of Kennedy's guilt beyond a reasonable doubt for murder, felonious assault, aggravated robbery, discharge of a firearm over prohibited premises, and having a weapon under disability. Thus, we conclude that there was sufficient evidence to convict Kennedy.

{¶ 72} As to the manifest weight of the evidence, "[d]eterminations of credibility and weight of the testimony remain within the province of the trier of fact." *State v. Newman*, 8th Dist. Cuyahoga No. 109182, 2020-Ohio-5087, ¶ 27, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "[T]he factfinder may take note of the inconsistencies and resolve them accordingly, 'believ[ing] all, part or none of a witness's testimony.'" *Id.*, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Coupled with the bench trial presumption that the trial court knows and follows the law, and relies only on relevant material, and competent evidence in arriving at its judgment, this court

finds that the record does not support that this is the exceptional case where the evidence weighs heavily against conviction.

**{¶ 73}** The third and fourth assignments of error are overruled.

**{¶ 74}** Judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

ANITA LASTER MAYS, JUDGE

EILEEN A. GALLAGHER, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR