[Cite as *State v. Moore*, 2026-Ohio-1284.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                     No. 115503

    v.                           :

MARK MOORE,                       :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 9, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-25-699939-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lucas Kirkland, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Robert McCaleb, Assistant Public Defender, *for appellant*.

DEENA R. CALABRESE, J.:

{¶ 1} Following a bench trial held July 9, 2025, the trial court found defendant-appellant Mark Moore guilty of one count of domestic violence. The trial court subsequently sentenced appellant to one year of community-control sanctions

under the supervision of the adult probation department's community-based correctional facility unit and a term of postrelease control. Appellant timely appealed, arguing that the trial court's guilty verdict was against the manifest weight of the evidence. Finding no merit to the appeal, we affirm.

## I. Procedural History and Trial

### A. Procedural Background

{¶ 2} On March 13, 2025, the Cuyahoga County Grand Jury returned a one-count indictment charging appellant with domestic violence, a felony of the third degree in violation of R.C. 2919.25(A). The charges stemmed from his mother's February 28, 2025 report that appellant had attacked her in their shared home.

{¶ 3} Following discovery and pretrial conferences, the case came on for trial on July 9, 2025. Prior to the commencement of trial, appellant waived his right to trial by jury on the record. The signed waiver was docketed that morning. The case proceeded to trial before the bench the same day. After opening statements, the trial court took testimony from three witnesses.

### B. The State's Case-in-Chief

{¶ 4} The State called two witnesses at trial. We summarize their testimony in order.

#### 1. Testimony of B.S.

{¶ 5} B.S. testified that she was 62 years of age, a widow, and resided in Parma, Ohio. She identified appellant as her son and stated that he had previously lived with her. B.S. described her son as an alcoholic:

I knew when I took him in that he was an alcoholic and I was hoping that as a mother I could change that. And I lived with him on a day-to-day basis. I prayed about it and everything, and it never changes, it just progressively got worse.

(Tr. 14.) B.S. described the end of their time living together as "like a hostage situation" and "really bad." (Tr. 14.) According to B.S., appellant did not stop drinking, and she, "in turn, drank just to deal with it." (Tr. 14.)

{¶ 6} B.S. testified concerning events leading to the purported incident on February 28, 2025. She stated that during previous days appellant had "been drinking and was being just weird." (Tr. 16.) Specifically, appellant had been sitting in the dark with the curtains drawn and told her he was no longer able to work. B.S. testified that on February 27, 2025, she summoned Parma police because she was "afraid" and "didn't know what was wrong with him." (Tr. 16.) According to B.S., the police advised her that appellant was considered a tenant not subject to removal except through legal proceedings. (Tr. 16.) She testified that the police refused to remove appellant from the household "unless he put his hands on [her]." (Tr. 16.) According to B.S., after the police visit appellant, whom she described as a large man, "carried on" the entire day and that it "got really dramatic." (Tr. 16.) B.S. testified that she "screamed leave me the F alone because [appellant] kept messing with [her]." (Tr. 19.) She stated that she "thought [she] was going to die that night, as mad as he became" because of the police visit. (Tr. 18.)

{¶ 7} B.S. stated that on February 28, 2025, between 11:00 a.m. and noon, appellant wanted her to buy him cigarettes. B.S. testified that she followed the

advice of others and told him she did not have the money to do so. He "became upset" when she refused his demand. (Tr. 17.) Specifically:

> [H]e had asked me to get him some cigarettes and when I did what I was told by the family to just tell him I couldn't afford to get his stuff anymore, and he became angry and that's when my face got shoved in a freezer door by him.
>
> . . .
>
> He just — he became angry because I refused. I wasn't going to get all that stuff anymore and into the freezer door I went, the top. My whole right side of my body went into the refrigerator.

(Tr. 17 and 20.) B.S. stated that she then left the house. She "lied and said [she] was going to the store" but instead "went to the police station." (Tr. 20.) B.S. testified that the police saw "her face was swollen" and "took pictures." (Tr. 21.) According to B.S., the police asked her to sit in a park while they removed appellant from the home.

{¶ 8} At that point the State identified two exhibits, State's exhibit Nos. 1 and 2, which were pictures of both sides of B.S.'s face. Referencing State's exhibit No. 2, B.S. testified that "[t]he whole right side of [her] face went right into the freezer door." (Tr. 23.)

{¶ 9} B.S. testified that she delayed seeking medical attention because she was afraid to lose her job. She stated that she "was in trouble financially" so she told the police she would visit a hospital as soon as possible. (Tr. 23.) B.S. testified she went to an emergency room in Parma the following Sunday and that they took x-rays.

{¶ 10} The State then identified State's exhibit No. 3 as B.S.'s certified medical records related to the incident, which appellant conceded had been produced in discovery. The trial court permitted appellant to testify regarding the records, overruling appellant's objection. The exhibit indicates that B.S. visited the hospital on March 3, 2025. It references, inter alia, "concussion without loss of consciousness" and "[c]ontusion, multiple sites." B.S. further testified that she suffered from confusion and pain "for weeks" and that she "[hasn't] been right since." (Tr. 27.) Her direct testimony ended with a reference to a previous domestic violence incident with appellant. The trial court took "judicial notice [that appellant is] on probation to me in case number 678418." (Tr. 28.)

{¶ 11} On cross-examination, B.S. admitted that according to her direct testimony Parma police had informed her on February 27, 2025, that they could not remove appellant from the home unless he put his hands on her and then the very next day she told the police he did precisely that. Appellant also sought to impeach B.S.'s account of the injuries she sustained based upon a handwritten statement that was not admitted into evidence and the medical records identified as State's exhibit No. 3.

{¶ 12} On redirect, the State elicited further testimony from B.S. using her medical records. Specifically, page 8 of State's exhibit No. 3 contains a body diagram identifying three contusion sites on B.S.'s right side and none on her left side.

## 2. Testimony of Officer Sean Gilligan

{¶ 13} The State next called Parma police officer Sean Gilligan. Officer Gilligan testified that he served in the "uniform patrol division" and had worked in that capacity for nine years. (Tr. 43.) He testified that on February 28, 2025, an individual came to the police lobby to make a complaint and he was the responding officer. In conducting an investigation, it was "[d]etermined to be domestic violence," and it was further "determined that the preferred outcome would be to make an arrest, which is what [they] did." (Tr. 44-45.) Officer Gilligan also testified that he photographed B.S., the victim. He identified State's exhibit Nos. 1 and 2.

## C. Admission of Exhibits and Appellant's Crim.R. 29 Motion

{¶ 14} The State rested subject to the admission of exhibits. Appellant indicated his only objection was to the authenticity of State's exhibit No. 3, the medical records. The trial court admitted that exhibit over appellant's objection. In addition to the three exhibits described above, the trial court also accepted, without objection, State's exhibit No. 4, a certified journal entry for case number CR-23-678418, and State's exhibit No. 5, a certified journal entry for case number 2012 CRB 038835.

{¶ 15} Appellant then made a Crim.R. 29 motion for acquittal. His core argument was that B.S.'s testimony was self-serving and not credible. More specifically, appellant argued that B.S. had followed the roadmap given to her by Parma police, falsely accusing her son of violence to trigger his arrest and removal

from the home, and further that the photos and medical records did "not show any injury whatsoever." (Tr. 50.) The court denied appellant's Crim.R. 29 motion.

### D. Appellant's Case-in-Chief

{¶ 16} Appellant admitted that he had two prior domestic violence convictions, one for domestic violence against his mother and another involving the mother of his child. With respect to the events of February 28, 2025, he testified that it was uneventful until Parma police arrived to arrest him. According to appellant, B.S. came to his room in the morning to ask him if he needed to shower "because she wanted to do laundry." (Tr. 55.) He said he would take a shower later. She returned about an hour later to ask if he "needed anything from the store." (Tr. 55.) Appellant continued:

> I told her just a pack of cigarettes and she said okay and she went down, left, and the next thing I know the dog is barking, I looked out the front window, officers were there.

(Tr. 55.)

{¶ 17} Appellant testified that he assumed the police visit related to the day before, when B.S. told him that "she called them on [him] because she was afraid of [him] and she wanted [him] out of the house." (Tr. 56.) He testified that he asked her why she was afraid and that she responded that he looked like his father and watched horror movies. (Tr. 56.)

{¶ 18} Appellant flatly denied shoving his mother into the refrigerator, putting his hands on her face, or otherwise putting his hands on her. (Tr. 57.) He insisted she just wanted him out of the house.

{¶ 19} On cross-examination, appellant admitted he had a prior domestic-violence conviction regarding a conflict with his mother but stated he "didn't put [his] hands on her then either." (Tr. 59.) He acknowledged hearing his mother's testimony and viewing the pictures of her face and the medical records describing a concussion and multiple contusions. He nevertheless testified:

Q.    So it's your testimony today that your mother did this to herself?

A.    Yes.

(Tr. 60.)

### E. Renewed Crim.R. 29 Motion, Closing Arguments, and Verdict

{¶ 20} The defense rested and renewed its Crim.R. 29 motion, which the trial court denied. Counsel gave their closing arguments.

{¶ 21} Following a recess, the trial court found appellant guilty of domestic violence in violation of 2919.25(A). It stated:

> The Court finds there is evidence believed by the Court that the defendant did knowingly cause or attempt to cause physical harm to [B.S.], who was a family or household member.

> Furthermore, that he had two prior offenses, was convicted in case number 678418 and CRB 038835 in Cleveland Municipal Court, two offenses of domestic violence or sections that were commensurate with domestic violence.

(Tr. 67-68.)

{¶ 22} The trial court scheduled sentencing for a later date, ordering a presentence-investigation report and a community-based correctional facility referral.

## F. Sentencing

**{¶ 23}** The sentencing hearing took place on August 7, 2025. Because appellant has not assigned error with respect to sentencing, we will not describe those proceedings in detail. The trial court sentenced appellant to one year of community-control sanctions under the supervision of the adult probation department's community-based correctional facility unit, with several specified conditions, and a term of postrelease control.

**{¶ 24}** This timely appeal followed.

## II. Assignment of Error

**{¶ 25}** Appellant presents a single assignment of error for our review:

> The conviction here was obtained against the manifest weight of the evidence.

**{¶ 26}** Finding no merit to the assignment of error, we affirm.

## III. Analysis

### A. Standard of Review

**{¶ 27}** "A manifest-weight-of-the-evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion." *Berea v. Blackshear*, 2025-Ohio-4757, ¶ 14 (8th Dist.), citing *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). *See also State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.). "In our manifest weight review of a bench trial verdict, we recognize that the trial court serves as the factfinder, and not the jury." *Cleveland v. McCoy*, 2023-Ohio-3792, ¶ 26 (8th Dist.), citing *State v. Travis*, 2022-Ohio-1233, ¶ 28 (8th Dist.); *see also Cleveland v. Hale*, 2024-Ohio-2712, ¶ 4 (8th Dist.) (analyzing

manifest-weight issue in context of bench trial); *Cleveland v. Clark*, 2024-Ohio-4491, ¶ 45 (8th Dist.) (same); *State v. Kennedy*, 2024-Ohio-1586, ¶ 65 (8th Dist.) (same). Accordingly, this court has previously written:

> "[T]o warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered."

*Kennedy* at ¶ 65, quoting *State v. Strickland*, 2009-Ohio-3906, ¶ 25 (8th Dist.). An appellate court will reverse on manifest weight "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins*, 78 Ohio St.3d at 387. This is because "in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact." *State v. Metz*, 2019-Ohio-4054, ¶ 70 (8th Dist.); *see also Cleveland v. Johns*, 2024-Ohio-3301, ¶ 24 (8th Dist.). Indeed, an appellate court "'"may not substitute its own judgment for that of the finder of fact."'" *Id.*, quoting *State v. Harris*, 2021-Ohio-856, ¶ 33 (8th Dist.), quoting *State v. Maldonado*, 2020-Ohio-5616, ¶ 40 (8th Dist.). *See also State v. McGrath*, 2025-Ohio-2600, ¶ 35 (8th Dist.).

## B. Discussion

{¶ 28} The trial court heard the competing testimony of victim B.S. and appellant. Simply put, B.S. testified that appellant, her own son, pushed her into an appliance in a fit of anger, thereby injuring the right side of her head and body. Appellant cross-examined B.S. by questioning the extent of her injuries and delayed

reporting. Appellant's cross-examination also confirmed that B.S. admitted to wanting appellant out of her house, that she had been informed by Parma police that they could not remove appellant unless he laid hands on her, and that according to B.S. precisely that scenario played out the next morning. Appellant testified on his own behalf and simply denied he attacked his mother in any fashion and that her police report was a pretext to accomplish her goal of removing him from the home.

{¶ 29} Appellant does not contend that B.S. provided inconsistent testimony, but rather that her testimony was not credible. He mainly points to B.S.'s delayed trip to the hospital as suggesting she had not actually been injured and further argues that the photographs and medical records did not adequately establish injury. With respect to the delay, however, B.S. testified that she did not immediately seek treatment because she needed to go to work and feared losing her job. "Generally we must give deference to the trier of fact who has the opportunity to assess the victim's demeanor and inconsistencies." *State v. Sefcik*, 2014-Ohio-5792, ¶ 14 (8th Dist.). As in *Sefcik*, another manifest-wight case, "[t]he trial court heard all the evidence, including the inconsistencies in [the victim's] testimony, and determined [the victim] credible[.]" *Id*. at ¶ 16.

{¶ 30} In addition, with respect to the nature and extent of B.S.'s injuries, "[t]his court has held that, because the word 'attempt' is in the domestic violence statute, 'an offender does not have to cause a tangible injury to his victim in order to be convicted of domestic violence in violation of R.C. 2919.25(A).'" *Blackshear*, 2025-Ohio-4757, at ¶ 16 (8th Dist.), quoting *State v. Stover*, 2017-Ohio-291, ¶ 15

(8th Dist.). In *Blackshear*, the defendant-appellant highlighted the purported lack of "visible evidence" of injury to the victim in arguing that his domestic-violence conviction was against the manifest weight of the evidence. This court rejected that contention: "To be convicted of domestic violence under R.C. 2919.25(A), visible evidence of an injury is not required." *Blackshear* at ¶ 18. Even if it were required, however, as in *Sefcik* "[t]here was physical evidence supporting [the victim's] version of events in the kitchen." *Sefcik* at ¶ 15. The State offered photographs of each side of B.S.'s face, along with medical records indicating multiple contusions on the right side of her body and symptoms of a concussion. It was for the trial court to weigh those exhibits in light of the competing testimony.

{¶ 31} Appellant also suggests that if B.S. was in fact injured, she deliberately hurt herself as a pretext to have appellant removed from the house. As already noted, appellant highlights the undisputed fact that the purported attack occurred the day after Parma police informed B.S. that appellant would need to "put his hands on" her if she wanted him removed without eviction proceedings. While we acknowledge that the timing could be viewed as undermining B.S.'s credibility, the trial court was presented with, and rejected, that defense theory. The trial court had the benefit of observing the witnesses. Having heard the testimony of both mother and son, the trial court chose to credit B.S.'s testimony. "In this he-said/she-said type of case with limited physical evidence, we must defer to the trier of fact's resolution of disputed facts." *Sefcik* at ¶ 16. In other words, "[i]f a case amounts to a 'he said, she said' dispute, [this court] will not second-guess the trier of fact's

resolution of that dispute where the defendant has not set forth any corroborating evidence as to why this court should disrupt that [resolution], other than reiterating to us what 'he said.'" (Cleaned up.) *State v. Lanier*, 2021-Ohio-379, ¶ 22 (8th Dist.), quoting *State v. Taylor*, 2016-Ohio-2765, ¶ 14 (9th Dist.).

{¶ 32} We have independently reviewed the testimony of each witness and every exhibit admitted into evidence. On this record, we cannot conclude that this is the exceptional case where the trial court clearly lost its way and created a manifest miscarriage of justice. Appellant's sole assignment of error is overruled.

{¶ 33} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

DEENA R. CALABRESE, JUDGE

LISA B. FORBES, P.J., and
EILEEN A. GALLAGHER, J., CONCUR